**ORIGINAL**

1  RON BENDER (California SBN 059695)
2  NELLWYN VOORHIES (California SBN 168698)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   1801 Avenue of the Stars, Suite 1120
3  Los Angeles, California 90067
   Telephone: (310) 229-1234; Facsimile: (310) 229-1244
4
5  SALLIE B. ARMSTRONG (Nevada SBN 001243)
   ARMSTRONG MILLER, LLP
6  427 West Plumb Lane
   Reno, Nevada 89509
7  Telephone: (775) 329-5900; Facsimile: (775) 786-5443

8  Attorneys for Debtors
   and Debtors in Possession

9                UNITED STATES BANKRUPTCY COURT
10
                     FOR THE DISTRICT OF
11
                        RENO, NEVADA
12
    In re                          Case No. BK-N-02-50085 GWZ
13                                  CHAPTER 11 Jointly
    STATE LINE HOTEL, INC., a       Administrated with
14  Nevada corporation,              BK-N-02-50081 GWZ
                                     BK-N-02-50083 GWZ
15              Debtor.              BK-N-02-50082 GWZ
                                     BK-N-02-50086 GWZ
16  □ Affects this Debtor.    /      BK-N-02-50084 GWZ
    ⊠ Affects all Debtors.    /      BK-N-02-50080 GWZ
17  □ Affects STATE LINE CASINO, a
       Nevada general partnership,/  SUBMISSION OF (1) ASSET
18  □ Affects STATE LINE             PURCHASE AGREEMENT; (2)
       PROPERTIES, INC., a Utah      REAL PROPERTY PURCHASE
19     Corp.          /              AGREEMENT NO. 1; AND (3)
20  □ Affects STATE LINE             REAL PROPERTY PURCHASE
       PROPERTIES, LTD., a Utah      AGREEMENT NO 2 IN SUPPORT
21     limited partnership,   /      OF DEBTORS' MOTION FOR
    □ Affects STATE LINE             ORDER AUTHORIZING DEBTORS
22     APARTMENTS, LTD., a Utah      TO (1) SELL ASSETS FREE AND
       general partnership,   /      CLEAR OF LIENS; (2) ASSUME
23  □ Affects JIM'S ENTERPRISES,     AND ASSIGN CERTAIN
       INC., a Nevada Corp.   /      EXECUTORY CONTRACTS AND
24  □ Affects SMITH PROPERTIES, a    UNEXPIRED REAL PROPERTY
       Nevada general partnership/   LEASES; AND (3) TO REJECT
25                                   CERTAIN LEASES AND
                                     CONTRACTS
26
27                                   Date:  May 21, 2002
                                     Time:  9:30 a.m.
28



1    Debtors and Debtors-in-Possession herein, in support of

2   their Motion for Order Authorizing Debtors to (1) Sell Assets

3   Free and Clear of Liens; (2) Assume and Assign Certain Executory

4   Contracts and Unexpired Real Property Leases; and (3) To Reject

5   Certain Leases and Contracts, hereby submit the following:

6        1.    Exhibit 1 - Asset Purchase Agreement (begins at page

7              3);

8        2.    Exhibit 2 - Real Property Purchase Agreement No. 1

9              (begins at page 136); and

10       3.    Exhibit 3 - Real Property Purchase Agreement No. 2

11             (begins at page 214).

12

13

14  Dated:  April 23, 2002                LEVENE, NEALE, BENDER, RANKIN
                                          & BRILL, L.L.P.
15

16

17                                        Ron Bender
                                          Nellwyn W. Voorhies
18                                        Attorneys for Debtors
                                          and Debtors-in-Possession
19

20

21

22

23

24

25

26

27

28

                                    2



EXhibit A

# ASSET PURCHASE AGREEMENT

### by and among

Jim's Enterprises, Inc., a Nevada corporation
State Line Hotel, Inc., a Nevada corporation
State Line Casino, a Nevada general partnership
Smith Properties, a Nevada general partnership
State Line Properties, Inc., a Utah corporation
State Line Properties, Ltd., a Utah limited partnership

"Sellers"

Wendover Casinos, Inc., a Nevada corporation
Wendover Commercial Properties, Inc., a Utah corporation

"Buyers"

EXHIBIT __1__

15    3

# TABLE OF CONTENTS



Page

1. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1.

2. THE TRANSACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.
   2.1  Sale of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.
   2.2  Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.
   2.3  Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14.
   2.4  Terms of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14.
        2.4.1  Credit for Assumed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . 14.
        2.4.2  Balance of Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . 14.
   2.5  Post Closing Escrow Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 14.
   2.6  Title and Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15.
   2.7  Liabilities; Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16.
   2.8  Accounts Receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17.
   2.9  Bankroll Funds and Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17.
   2.10 Promotions; Customer Deposits; Wagers . . . . . . . . . . . . . . . . . . . . . 17.
   2.11 Gaming Chips and Tokens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17.
   2.12 Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18.

3. CONDITION AND INSPECTION OF ASSETS; FINANCING . . . . . . . . . . . . . 18.

4. REPRESENTATIONS AND WARRANTIES OF SELLERS . . . . . . . . . . . . . . 19.
   4.1  Organization and Good Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . 19.
   4.2  Enforceability; Authority; No Conflict . . . . . . . . . . . . . . . . . . . . . . . . 20.
   4.3  Financial Statements, Gaming Reports, Bankruptcy Court Filings and
        Banks' Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20.
   4.4  Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21.
   4.5  Sufficiency of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21.
   4.6  Description of Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21.
   4.7  Title to Assets; Encumbrances . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22.
   4.8  Condition of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22.
   4.9  Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23.
   4.10 No Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23.
   4.11 Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23.
        4.11.1    Taxes Paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23.
        4.11.2    Delivery of Tax Returns . . . . . . . . . . . . . . . . . . . . . . . . . . 23.
        4.11.3    Occasional Sale Exemption . . . . . . . . . . . . . . . . . . . . . . . 23.
   4.12 Compliance with Legal Requirements; Governmental Authorizations . . 23.
   4.13 Absence of Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24.
   4.14 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25.
   4.15 Contracts, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25.
   4.16 Labor Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26.

J:\COREL\WPDA*\    1 Casinos\Asset Purchase Agreement 3-27-02.wpd
03/28/2 (Thu) 9:19am

4.17    ERISA and Related Matters ............. .............. 27.
4.18    Insurance ...................................... 27.
4.19    Consents; No Violations ................................. 28.
4.20    Environmental Matters ................................ 28.
4.21    Employees .......................................... 29.
4.22    Intangible Property Assets ............................ 30.
4.23    Complimentaries; Clubs; Promotions, Wagers; Deposits ........... 32.
4.24    Disclosure ........................................... 32.
4.25    HSR Act ............................................ 32.

5.    REPRESENTATIONS AND WARRANTIES OF BUYERS ............... 32.
5.1    Due Organization .................................... 32.
5.2    Due Authorization .................................... 32.
5.3    No Violations ........................................ 33.

6.    COVENANTS OF SELLERS PRIOR TO CLOSING ................... 33.
6.1    Operation of Businesses ................................ 33.
6.2    Negative Covenant .................................... 34.
6.3    Required Approvals ................................... 34.
6.4    Notification ......................................... 34.
6.5    Best Efforts ......................................... 34.
6.6    Interim Financial Statements, Gaming Reports, and Other Items ..... 34.
6.7    Change of Name ...................................... 35.
6.8    Assigned Contracts ................................... 35.
6.9    Employees and Employee Benefits ........................... 35.
        6.9.1  Termination ................................... 35.
        6.9.2  Employment of Employees by Buyers .................... 35.
        6.9.3  Salaries, Benefits, and Employment Taxes ................ 36.
        6.9.4  Sellers' Retirement and Savings Plans ................... 36.
        6.9.5  No Transfer of Plan Assets .......................... 36.
        6.9.6  Collective Bargaining Matters ........................ 36.
        6.9.7  General Employee Provisions ........................ 36.
        6.9.8  Certain Severance Payments ......................... 37.
6.10   Sale Motion ......................................... 37.

7.    COVENANTS OF BUYERS PRIOR TO CLOSING ..................... 37.
7.1    Required Approvals ................................... 37.
        7.1.1  Nevada Gaming Authorities Approvals .................... 37.
        7.1.2  Other Requirements ............................... 37.
7.2    Best Efforts ......................................... 38.

8.    CONDITIONS PRECEDENT TO BUYERS' OBLIGATION TO CLOSE ...... 38.
8.1    Due Diligence Investigation .............................. 38.
8.2    Title Exceptions; Title Insurance ............................ 38.
8.3    Accuracy of Representations ............................ 38.
8.4    Sellers' Performance .................................. 38.
8.5    Consents ........................................... 38.

J:\COREL\WPDATA\...\...\ ...    \ I Casinos Asset Purchase Agreement 3-27-02.wpd
03/28/2 (Thu) 9:19am

17    5

8.6    Additional Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39.
8.7    No Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39.
8.8    No Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39.
8.9    Governmental Authorizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39.
8.10   Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.
8.11   WARN Act Notice Period and Employees . . . . . . . . . . . . . . . . . . . . 40.
8.12   Closing Under Ancillary Real Property Sale Agreements . . . . . . . . . . . 40.
8.13   Chapter 11 Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.

9.    CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE . . . . . 40.
9.1    Accuracy of Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.
9.2    Buyers' Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.
9.3    Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.
9.4    Additional Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40.
9.5    No Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.
9.6    Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.
9.7    Consulting and Noncompete Agreements . . . . . . . . . . . . . . . . . . . . . 41.
9.8    WARN Act Notice Period and Employees . . . . . . . . . . . . . . . . . . . . . 41.
9.9    Closing Under Ancillary Real Property Sale Agreements . . . . . . . . . . . 41.

10.    TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.
10.1   Termination Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.
10.2   Automatic One-Month Extensions of June 30, 2002 Date . . . . . . . . . . 42.
10.3   Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42.
10.4   Sellers' Liquidated Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42.

11.    ESCROW, CLOSING, PRORATIONS, COSTS, AND COMMISSIONS . . . . . 43.
11.1   Escrow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43.
11.2   Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43.
11.3   Closing Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43.
       11.3.1 Sellers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43.
       11.3.2 Buyers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44.
11.4   Prorations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45.
11.5   Fees and Expenses; Costs of Sale . . . . . . . . . . . . . . . . . . . . . . . . . 45.
11.6   Brokerage Commissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45.

12.    TAXES, FURTHER ASSURANCES, AND OTHER COVENANTS . . . . . . . . 46.
12.1   Payment of All Taxes Resulting from Sale of Assets by Sellers . . . . . . 46.
12.2   Removing Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46.
12.3   Reports and Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46.
12.4   Assistance in Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46.
12.5   Noncompetition, Nonsolicitation and Nondisparagement . . . . . . . . . . . 46.
       12.5.1 Noncompetition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46.
       12.5.2 Nonsolicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47.
       12.5.3 Nondisparagement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47.
       12.5.4 Modification of Covenant . . . . . . . . . . . . . . . . . . . . . . . . . . . 47.
12.6   Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47.

J:\COREL\WPDATA\P\...\Ps:    : Asset Purchase Agreement 3-27-02.wpd
03/28/2 (Thu) 9:19am

18   6

12.7 Tax Clearance Certificates .......................... 47.
12.8 Unemployment Compensation Law Certificates .............. 48.

13. INDEMNIFICATION; REMEDIES .................................. 48.
13.1 Survival ................................................ 48.
13.2 Indemnification and Reimbursement by Sellers ............ 48.
13.3 Indemnification and Reimbursement by Sellers -- Environmental
     Matters ................................................ 49.
13.4 Indemnification and Reimbursement by Buyers ............. 50.
13.5 Post Closing Escrow; Consulting and Noncompete Agreements ..... 50.
13.6 Third-party Claims ...................................... 50.
13.7 Other Claims ........................................... 51.
13.8 Indemnification in Case of Strict Liability or Indemnitee Negligence. . . 52.
13.9 Time Limitations ....................................... 52.
13.10 No Recourse Against Individual General Partners ........... 52.

14. MISCELLANEOUS ............................................ 52.
14.1 Risk of Loss ........................................... 52.
14.2 Amendment or Modification ............................... 53.
14.3 Notices ............................................... 53.
14.4 Assignment ............................................ 54.
14.5 Governing Law ......................................... 54.
14.6 Headings .............................................. 54.
14.7 Entire Agreement ...................................... 54.
14.8 Attorneys' Fees and Expenses ........................... 55.
14.9 Mutual Contribution .................................... 55.
14.10 Severability .......................................... 55.
14.11 Gender and Number ..................................... 55.
14.12 Binding Effect ........................................ 55.
14.13 Timing ............................................... 55.
14.14 IRS Real Estate Sales Reporting ....................... 55.
14.15 Non-Foreign Entity .................................... 55.
14.16 Warranty of Authority ................................. 56.
14.17 Public Announcements .................................. 56.
14.18 Exclusive Jurisdiction; Service of Process ............. 56.
14.19 Enforcement of Agreement .............................. 56.
14.20 Waiver; Remedies Cumulative ........................... 57.
14.21 Disclosure Letter ..................................... 57.
14.22 Execution of Agreement ................................ 57.
14.23 Obligations ........................................... 57.
14.24 Representatives of Sellers ............................ 57.
14.25 Interpretation ........................................ 58.
14.26 Accounting Terms and Determinations ................... 59.



## Index of Exhibits

The following Exhibits are attached to this Agreement and incorporated herein by this reference:

| | |
|---|---|
| Exhibit 1.31: | Consulting and Noncompete Agreement |
| Exhibit 1.43: | Equipment |
| Exhibit 1.46: | Excluded Assets |
| Exhibit 1.64: | Land |
| Exhibit 2.5: | Post Closing Escrow Agreement |
| Exhibit 2.7: | Assigned Contracts |
| Exhibit 2.12 | Bidding Procedures |



## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into by and among Jim's Enterprises, Inc., a Nevada corporation, State Line Hotel, Inc., a Nevada corporation, State Line Casino, a Nevada general partnership, Smith Properties, a Nevada general partnership, State Line Properties, Inc., a Utah corporation, and State Line Properties, Ltd., a Utah limited partnership, collectively, as "Sellers;" and Wendover Casinos, Inc., a Nevada corporation, and Wendover Commercial Properties, Inc., a Utah corporation, collectively, as "Buyers;" with reference to the following facts:

A.    Sellers are the owners of the real property, improvements, personal property, goodwill, and casino businesses situated at 100 Wendover Boulevard, Wendover, Nevada, known as  the "State Line Hotel Casino," and at 101 Wendover Boulevard, Wendover, Nevada, known as the "Silver Smith Hotel Casino," and certain ancillary real properties.

B.    Sellers desire to sell to Buyers and Buyers desire to purchase from Sellers substantially all of the assets of Sellers' businesses known as the "State Line Hotel Casino" and the "Silver Smith Hotel Casino" and certain associated real properties utilized for parking and other related purposes on the terms and conditions set forth herein.

C.    Sellers have sought relief under Chapter 11 of Title XI of the United States Code (the "Bankruptcy Code") by filing a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").

D.    In order to facilitate the transactions contemplated under this Agreement, Sellers will file with the Bankruptcy Court a motion under Section 363 of the Bankruptcy Code for approval of this Agreement and the transactions contemplated hereunder (the "Sale Motion"). Upon entry of an order of the Bankruptcy Court approving the Sale Motion (the "Sale Order") and upon satisfaction or waiver of the conditions set forth in this Agreement, Buyers will purchase from Sellers the described assets, which will be transferred to Buyers in accordance with the procedures and upon the terms and subject to the satisfaction of the conditions set forth in this Agreement.

Based upon the foregoing, and in consideration of the mutual promises, representations, warranties, covenants, and agreements contained herein, the parties agree as follows:

1.    DEFINITIONS.  As used in this Agreement, the following terms shall have the following meanings unless the context otherwise requires:

1.1    "Affiliate" shall mean with respect to a particular individual: (a) each other member of such individual's Family; (b) any Person that is directly or indirectly controlled by any one (1) or more members of such individual's Family; (c) any Person in which

members of such individual's Family hold (individually or in the aggregate) a Material Interest; and (d) any Person with respect to which one (1) more members of such individual's Family serves as a director, officer, partner, member, manager, executor or trustee (or in a similar capacity).

With respect to a specified Person other than an individual: (a) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person; (b) any Person that holds a Material Interest in such specified Person; (c) each Person that serves as a director, officer, partner, member, manager, executor or trustee of such specified Person (or in a similar capacity); (d) any Person in which such specified Person holds a Material Interest; and (e) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; (b) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse and/or former spouse(s), (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) "Material Interest" means direct or indirect beneficial ownership of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

1.2     "Agreement" shall mean this Asset Purchase Agreement.

1.3     "Ancillary Real Property Purchase Agreements" shall mean the following:

(a) the Real Property Purchase Agreement No. 1 entered into by Peppermill Properties LLC, a Nevada limited liability company, Wendover Commercial Properties, Inc., Smith Properties, State Line Properties, Ltd., a Utah limited partnership, and State Line Apartments, Ltd., a Utah limited partnership, for the purchase and sale for the sum of Three Million, One Hundred Thousand Dollars ($3,100,000) of the following real properties:

(i) vacant land owned by Smith Properties comprising approximately three and one-half (3 ½) acres situated west of the State Line Hotel Casino (APN 010-740-069 and a portion of APN 010-740-003);

(ii) vacant land owned by Smith Properties comprising approximately ten (10) acres situated west of the Silver Smith Hotel Casino (a portion of APN 010-740-102);

(iii) land owned by Smith Properties comprising approximately one and 27/100ths acres situated immediately west of the Silver Smith Hotel Casino (a portion of APN 010-740-    ) and including Sellers' human resources building;

(iv) vacant land owned by Smith Properties comprising approximately thirteen and 43/100ths (●43) acres situated northwest of ● Silver Smith Hotel Casino (a portion of APN 010-740-003);

(v) State Line RV park owned by State Line Properties, Ltd. (TPN 01-267-0-0003 and a portion of TPN 01-267-0-0002);

(vi) residential units known as the "Entertainer Units" owned by State Line Properties, Ltd. situated east of the State Line Hotel Casino (a portion of TPN 01-266-0-0003);

(vii) residential units known as the "Dorm A Units," owned by State Line Properties, Ltd. (TPN 01-252-0-0002); and

(viii) residential units known as "Apartments, Ltd.," owned by State Line Apartments, Ltd. (TPN 01-252-0-0023); and

(b) the Real Property Purchase Agreement No. 2 entered into by Peppermill Properties LLC, a Nevada limited liability company, Wendover Commercial Properties, Inc.,and State Line Hotel, Inc. for the purchase and sale for the sum of Three Million, Five Hundred Thousand Dollars ($3,500,000) of the following real properties:

(i) land and improvements known as the "Needlepoint Trailer Park" owned by State Line Hotel, Inc. (APN 010-740-023 and TPN 01-269-0-0007);

(ii) land and improvements known as the "Bonneville Apartments" owned by State Line Hotel, Inc. (APN 010-740-024);

(iii) vacant land situated at the corner of Pueblo and Alpine Streets comprising ten and 233/1000ths (10.233) acres owned by State Line Hotel, Inc. (with title being held in the name of "Stateline Hotel, Inc.") (APNs 010-702-004 and 010-702-013); and

(iv) vacant land situated northwest of the Silver Smith Hotel Casino comprising thirty-three and 501/1000ths (33.501) acres owned by State Line Hotel, Inc. (APN 010-740-021);

all as more particularly described in such Ancillary Real Property Sale Agreements.

1.4    "Appurtenances" shall mean all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of the Land, including all easements appurtenant to and for the benefit of any Land (a "Dominant Parcel") for, and as the primary means of access between, the Dominant Parcel and a public way, or for any other use upon which lawful use of the Dominant Parcel for the purposes for which it is presently being used is dependent, all water rights, water and sewer capacities and connections, commitments, utility rights and reservations, mineral rights, land use entitlements, and all rights existing in and to any streets, alleys, passages and other rights way included

thereon or adjacent there ⬤ (before or after vacation thereof), ⬤ vaults beneath any such streets.

1.5    "Assets" shall mean all of the assets and properties, whether real or personal, tangible or intangible, owned, leased or held for use by Sellers or any of them, excluding only the Excluded Assets. The Assets shall include, but not be limited to, (a) all items of Equipment and other personal property;  (b) all Assigned Contracts; (c) all data (historical and current) and rights to data (historical and current) of Sellers and files related thereto, including, without limitation, all customer files, data and information maintained by Sellers in connection with the Assets or Businesses, in any case, wherever located, whether in the form of hard copies, electronic media, or otherwise; (d) all Governmental Authorizations issued by any Governmental Body relating to the Businesses or the Assets to the extent same may be assigned consistent with their terms; (e) all Supplies; (f) all Real Property; (g) all Intangible Property Assets; (h) all books and Records incident to and currently used in the Businesses (except for corporate and Tax books and Records of  Sellers); (i) all rights to security deposits and deposits with utilities and Governmental Bodies attributable to the Businesses; (j) the Bankroll Funds; and (k) the Inventory.

1.6    "Assigned Contracts" shall have the meaning set forth in Section 2.7 hereof.

1.7    "Assignment and Assumption Agreement" shall mean the agreement executed by Buyers and Sellers at the Closing providing for the assignment to Buyers of the Assigned Contracts and the assumption of Sellers' obligations thereunder accruing or arising after the Closing Date in a form reasonably acceptable to Buyers and Sellers.

1.8    "Assignments" shall mean all assignments and other documents, agreements and instruments to be executed by Sellers at the Closing reasonably required by Buyers to transfer and convey all Assets comprising intangible and/or mixed property in a form reasonably acceptable to Buyers.

1.9    "Assumed Liabilities" shall have the meaning set forth in Section 2.7 hereof.

1.10    "Bankroll Funds" shall mean all Cash in cashier's cages, vaults, cash registers, bar and restaurant areas, Gaming Devices and associated equipment (as defined in NRS 463.0136) and bankroll held on the Real Property as of the Closing Date, less the percentage owned by vendors participating in revenues.

1.11    "Bankruptcy Claims" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

1.12    "Bankruptcy Code" has the meaning set forth in Paragraph C. of the Recitals hereof.

1.13    "Bankruptcy Court" shall have the meaning set forth in Paragraph C. of the Recitals hereof.

1.14    "Banks" shall mean Zions First National Bank, Wells Fargo Bank, N.A., Comerica Bank, and Red Hill Capitol Corporation, collectively.

1.15    "Bidding Procedures" shall have the meaning set forth in Section 2.12 hereof.

1.16    "Bills of Sale" shall mean all bills of sale and other documents, agreements and instruments to be executed by Sellers at the Closing reasonably required by Buyers to transfer and convey all Assets comprising tangible personal and/or mixed property in a form reasonably acceptable to Buyers.

1.17    "Breach" shall mean any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

1.18    "Break-Up Fee" shall have the meaning set forth in Section 2.12 hereof.

1.19    "Business Names" shall mean "State Line Hotel Casino" and "Silver Smith Hotel Casino," and all derivations thereof.

1.20    "Businesses" shall mean the real estate, casino, gift shop, gaming, sportsbook, restaurant, bar, hotel, and resort businesses of Sellers, as such businesses are conducted by Sellers or any of them on the Effective Date or prior to the Closing Date.

1.21    "Buyers" shall have the meaning set forth in the initial paragraph of this Agreement. The term "Buyer" shall mean either one (1) of the Buyers, individually.

1.22    "Buyer Indemnified Persons" shall have the meaning specified in Section 13.2 hereof.

1.23    "Cash" shall mean, when used in connection with any Person, all monetary and other items owned by that Person that are treated as cash in accordance with GAAP, consistently applied.

1.24    "Chapter 11 Case" shall have the meaning set forth in Paragraph C. of the Recitals hereof.

1.25    "Closing" shall mean the consummation of the Transactions.

1.26    "Closing Date" shall mean the date on which the Closing occurs pursuant to Article 11. hereof.

1.27    "COBRA" shall means the Consolidated Omnibus Reconciliation Act of 1986, including, without limitation, Code Sections 162(k) and 4980B and ERISA Sections 601 through 608, and all applicable state statutes mandating health insurance continuation coverage for employees.

1.28    "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.29    "Competing Transaction" shall have the meaning set forth in Section 2.12 hereof.

1.30    "Consent" shall mean any approval, consent, ratification, waiver or other authorization.

1.31    "Consulting and Noncompete Agreements" shall mean the Consulting and Noncompete Agreements to be entered into by and between (i) the respective Owners and Michael W. Devine, and (ii) Buyers at the Closing in the form of Exhibit 1.31.    The Consulting Agreements shall provide, without limitation, that Buyers shall have setoff rights against payments paid and to be paid thereunder for Damages resulting from a Breach of any representation, warranty, or covenant of Sellers contained in this Agreement or any document, instrument, or Contract executed pursuant hereto.

1.32    "Contract" shall mean any agreement, contract, lease, consensual obligation, promise or undertaking (whether written or oral and whether express or implied).

1.33    "Copyrights" shall have the meaning set forth in Section 4.22 hereof.

1.34    "Covenant of Sellers Not to Compete" shall mean the covenant of Sellers and their respective Affiliates not to compete as specified in Section 12.5 hereof.

1.35    "Damages" shall have the meaning set forth in Section 13.2 hereof.

1.36    "Deeds" shall mean all deeds and other documents, agreements and instruments to be executed by Sellers at the Closing reasonably required by Buyers to transfer and convey all Assets comprising the Real Property in a form reasonably acceptable to Buyers.

1.37    "Departments" shall mean the Nevada Department of Taxation and the Utah Department of Taxation, collectively.

1.38    "Disclosure Letter" shall mean the disclosure letter delivered by Sellers to Buyers concurrently with the execution and delivery of this Agreement.

1.39    "Due Diligence Period" shall mean the period of time commencing on the Effective Date and ending on the later of (a) May 13, 2002, or (b) the date forty-five (45) days after the Effective Date.

1.40    "Effective Date" shall mean the date of the full execution and delivery of this Agreement by all Persons comprising Sellers and Buyers.

1.41    "Encumbrance" shall mean any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way       sement, encroachment servitude, right of first option, r    t of first

refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

1.42    "Environmental Laws" shall means all federal, state, and local statutes, laws, rules, regulations, and ordinances and other Legal Requirements relating to the protection of human health or environmental matters, including, without limitation, those relating to fines, orders, injunctions, penalties, damages, contribution, cost recovery compensation, losses or injuries resulting from the release or threatened release of Hazardous Materials and the generation, use, storage, transportation, or disposal of Hazardous Materials, in any manner applicable to Sellers or the Real Property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.); the Hazardous Material Transportation Act (49 U.S.C. § 1801 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.); the Clean Air Act (42 U.S.C. § 7401 et seq.); the United States Environmental Protection Agency's Rules Concerning Underground Storage Tanks; the Toxic Substances Control Act of 1976 (15 U.S.C. § 2601 et seq.); the Safe Drinking Water Act (42 U.S.C. § 300 et seq.); the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.); the Federal Hazardous Substances Act (15 U.S.C. § 1261et seq.); the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.); Chapter 444 of the NRS, Sanitation; Chapter 445A of the NRS, Water Control; Chapter 445B of the NRS, Air Pollution; Chapter 459 of the NRS, Hazardous Materials; Title 40 of the NRS, Public Health and Safety; Title 47 of the NRS, Forestry, Forest Products and Flora; and the Uniform Fire Code; Utah Hazardous Substances Mitigation Act (Utah Code Ann. §19-6-301 et seq.); Utah Solid and Hazardous Waste Act (Utah Code Ann. §19-6-101 et seq.); Utah Underground Storage Tank Act (Utah Code Ann. §19-6-401 et seq.); Utah Water Quality Act (Utah Code Ann. §19-5-101 et seq.); Utah Safe Drinking Water Act (Utah Code Ann. §19-4-101 et seq.); Utah Radiation Control Act, (Utah Code Ann. §19-3-101 et seq.); Utah Air Conservation Act (Utah Code Ann. §19-2-101 et seq.); Utah Occupational Safety and Health Act (Utah Code Ann. §134A-6-101 et seq.); and any related regulations set forth in the Utah Administrative Rules, each as heretofore and hereafter amended, modified, replaced or supplemented, and any future or present local, state or federal laws, statutes, rules and regulations promulgated thereunder or pursuant thereto, and any other present or future law, ordinance, rule, regulation, permit or permit condition, Order or directive addressing environmental, health or safety issues of or by any Governmental Body exercising executive, legislative, judicial, regulatory or administrative functions which are applicable to the Real Property or Sellers or any of them.

1.43    "Equipment" shall mean all of the tangible personal property owned by Sellers which is located on and used in connection with the operation of the Real Property and/or the Businesses on the Effective Date, including, without limitation, all items of personal property listed on Exhibit 1.43, and all other furniture, fixtures, Gaming Devices, gaming tables, other gaming equipment, signs, office equipment, computers, copiers, telephone systems, restaurant furniture, restaurant equipment, bar equipment, security and fire protection equipment, gaming monitoring systems, sound production equipment (including, without limitation, all microphones, amplifiers, speakers and other audio equipment), bingo

7.

equipment, liquor and soft drink dispensing equipment, vehicles utilized in connection with the Businesses, and all other tangible personal property.

1.44    "Escrow Agent" shall mean Frontier Title Company, a California corporation, or such other escrow company reasonably acceptable to Sellers and Buyers.

1.45    "ERISA" shall mean the Employment Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder or with respect thereto.

1.46    "Excluded Assets" shall mean and be limited to (a) Sellers' Cash and cash equivalents (other than Bankroll Funds), accounts receivable, returned checks, and bank account(s); (b) Sellers' Encumbered slot machines, and all of Seller's gaming chips, tokens, and playing cards on hand as of the Closing Date; (c) Sellers' corporate seal(s), minute book(s), original Governing Documents, and other such books and Records as Sellers are required by Legal Requirement to retain, (d) rights that lawfully cannot be transferred by Sellers (provided, however, that such rights shall be held by Sellers for the benefit of Buyers and that Buyers at their option may act as Sellers' agent in order to enforce and obtain for Buyers the benefits of such rights; (e) Sellers' rights under this Agreement; (f) the rights and assets under the Plans; (g) all of Sellers' insurance policies and rights thereunder; (h) all of Sellers' personnel Records and other Records that Sellers are required by law to retain in their possession (provided, however, that Sellers shall provide copies thereof to Buyers as is reasonably required by Buyers for purposes of this Agreement); (i) all claims for refunds of Sellers' Taxes and other governmental charges of whatever nature relating to the operation of the Businesses prior to the Closing Date; and (j) the other assets listed on Exhibit 1.46.

1.47    "Exhibits" shall mean the exhibits attached to this Agreement, collectively. The term "Exhibit" shall mean any one (1) of the Exhibits, individually.

1.48    "Expenses" shall mean all of Buyers' expenses incurred in connection with its due diligence investigation and negotiation and legal, accounting, and other professional fees and expenses in connection with the Transactions, not to exceed Five Hundred Thousand Dollars ($500,000).

1.49    "Financial Statements" shall have the meaning set forth in Section 4.3 hereof.

1.50    "GAAP" shall mean generally accepted accounting principles for financial reporting consistently applied.

1.51    "Gaming Devices" have the meaning set forth in NRS 463.0155.

1.52    "Governing Documents" shall mean with respect to any particular entity, (a) if a corporation, the articles or certificate of incorporation and the bylaws; (b) if a general partnership, the partnership agreement and any statement of partnership; (c) if a limited partnership, the limited partnership agreement and the certificate of limited partnership; (d) if a limited liability company, the articles of organization and operating agreement; (e)

ATA\RAW\Peppermill Casinos\Asset Purchase A
03/28

if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (f) all equity holders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the equity holders of any Person; and (g) any amendment or supplement to any of the foregoing.

1.53    "Governmental Authorization" shall mean any Consent, license, registration or permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

1.54    "Governmental Body" shall mean any: (a) nation, state, county, city, town, borough, village, district or other jurisdiction; (b) federal, state, local, municipal, foreign or other government or political subdivisions thereof; (c) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); or (d) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

1.55    "Hazardous Materials" shall mean (a) any chemical, material, substance, mixture, waste, or item defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "regulated substances," "restricted hazardous waste," "toxic pollutants," "pollutants," "toxic substances" or words of similar import under any applicable local, state or federal law or under the regulations adopted or publications promulgated pursuant thereto, including, without limitation, Environmental Laws, or which is or becomes listed, regulated, or addressed by any federal, state, regional or local governmental authority because it is any way hazardous, toxic, polluting carcinogenic, otherwise adversely affects any part of the environment or creates risks of any such hazards or effects; (b) any oil, petroleum or petroleum derived substance, any drilling fluids, produced waters or other wastes associated with the exploration, development or production of crude oil, any flammable substances or explosives, any radioactive materials, any hazardous wastes or substances, any toxic wastes or substances or any other materials or pollutants which (i) pose a hazard to the Real Property or to persons on or about the Real Property, or (ii) cause the Real Property to be in violation of any Environmental Laws; (c) asbestos in any form which is or could become friable, radon gas, urea formaldehyde foam insulation, polychlorinated biphenyls; (d) infectious or medical waste; and (e) any other chemical, material or substance, exposure to which is prohibited, limited or regulated under any Environmental Law.

1.56    "HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act.

1.57    "HSR Balance Sheet" shall have the meaning set forth in Section 4.25 hereof.

Ra:/:Peppermill Casinos\Asset Purchase Agr-
03/28/2

1.58    "Improvements" shall mean all buildings, structures, fixtures and improvements located ⬤ the Land or included in the As⬤s, including those under construction, together with all plans, specifications, and warranties therefore.

1.59    "Indemnified Person" shall have the meaning set forth in Section 13.6 hereof.

1.60    "Indemnifying Person" shall have the meaning set forth in Section 13.6 hereof.

1.61    "Intangible Property Assets" shall have the meaning set forth in Section 4.22 hereof.

1.62    "Inventory" shall mean all of Sellers' inventory of food and beverages on hand at the Closing which are unopened and which are not outdated or unusable and otherwise meet the requirements of Section 2.9 hereof.

1.63    "Knowledge" shall have the following meaning: An individual will be deemed to have Knowledge of a particular fact or other matter if: (a) that individual is actually aware of that fact or matter; or (b) a prudent individual could be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation or warranty contained in this Agreement. A Person (other than an individual) will be deemed to have Knowledge of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor or trustee of that Person (or in any similar capacity) has, or at any time had, Knowledge of that fact or other matter (as set forth in [a] and [b] above), and any such individual (and any individual party to this Agreement) will be deemed to have conducted a reasonably comprehensive investigation regarding the accuracy of the representations and warranties made herein by that Person or individual.

1.64    "Land" shall mean the parcels of land depicted on Exhibit 1.64. The legal descriptions of the Land shall be based upon the approved ALTA surveys prepared pursuant to Section 3. hereof.

1.65    "Legal Requirements" shall mean any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

1.66    "Liability" or "Liabilities" shall mean with respect to any Person, any liability, claim, Tax, Bankruptcy Claim or other obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

1.67    "Marks" shall h  the meaning set forth in S  tion 4.22 hereof.

J:\CORELⁿⁿ       ⸱⸱⸱⸱⸱⸱ Casinos\Asset Purchase Agreement 2
                                      03/28/2 (Thu)

1.68    "Net Names" shall have the meaning set forth in Section 4.22 hereof.

1.69    "Nevada Gaming Authorities" shall mean the Nevada State Gaming Control Board and the Nevada Gaming Commission, or any other Governmental Body which has jurisdiction over gaming activities at the Real Property, collectively.

1.70    "NRS" shall mean the Nevada Revised Statutes, as amended.

1.71    "Order" shall mean any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Body or arbitrator.

1.72    "Owners" shall mean James W. Smith, Marian Barnwell, Billie Ann Devine, and Mary Carol S. Johnson, who, with their immediate family members, either individually or through one (1) or more entities, are the beneficial owners of One Hundred Percent (100%) of all equity interests of each of Sellers. The term "Owner" shall mean any one (1) of the Owners, individually.

1.73    "Part" shall mean a part or section of the Disclosure Letter.

1.74    "Patents" shall have the meaning set forth in Section 4.22 hereof.

1.75    "Permitted Exceptions" shall have the meaning set forth in Section 2.6 hereof.

1.76    "Person" shall mean an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Body.

1.77    "Plans" shall have the meaning set forth in Section 4.17 hereof.

1.78    "Post Closing Escrow Agreement" shall have the meaning set forth in Section 2.5 hereof.

1.79    "Post Closing Escrow Amount" shall have the meaning set forth in Section 2.4.2 hereof.

1.80    "Preliminary Title Reports" shall mean the preliminary title reports for the Real Property to be provided to Buyers pursuant to Section 2.6 hereof.

1.81    "Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

1.82    "Progressive Slot Liability" shall mean the Liability of Sellers for any jackpots and other payouts on any progressive Gaming Devices conveyed hereunder or otherwise required to be assumed by Buyers by the Nevada Gaming Authorities.

J:\CORELW:    Casinos-Asset Purchase Agreement 3-
    03/28/2 (Thu)

1.83    "Purchase Price" shall have the meaning set forth in Section 2.2 hereof.

1.84    "Real Property" shall mean the Land together with all Appurtenances thereof and all Improvements thereon.

1.85    "Record" shall mean information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

1.86    "Related Entity" shall have the meaning set forth in Section 4.25 hereof.

1.87    "Representative" shall mean with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

1.88    "Sale Motion" shall have the meaning set forth in Paragraph D. of the Recitals hereof.

1.89    "Sale Order" shall have the meaning set forth in Paragraph D. of the Recitals hereof.

1.90    "Sellers" shall have the meaning set forth in the initial paragraph of this Agreement. The term "Seller" shall mean any one (1) of the Sellers, individually.

1.91    "Software" shall mean all computer software and subsequent versions thereof, including source code, object, executable or binary code, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all files, data, materials, manuals, design notes and other items and documentation related thereto or associated therewith.

1.92    "Subsidiary" shall mean with respect to any Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the owner or one (1) or more of its Subsidiaries.

1.93    "Supplies" shall mean all of Sellers' restaurant, hotel, office, bar, and other supplies relating to the Businesses on hand at the Closing, including, without limitation, matches, napkins, place mats, glasses, silverware, computer paper and supplies, paper, kitchen supplies, serving carts and trays, and other dining, cooking and similar utensils, beds and bedding, towels, cleaning materials and supplies.

1.94    "Tax" or "Taxes" shall mean any income, gross receipts, gaming, room, hotel, license, payroll, employment, excise, severance, stamp, occupation, premium, property, ad valorem, environmental, windfall profit, customs, vehicle, airplane, boat, vessel or other title registration, capital stock, franchise, employees' income withholding, foreign or

J:\CORELLW·

·R Casinos\Asset Purchase Agreement 3-27 ·?? ·
03/28/2 (Thu) 9: ·?·?·

domestic withholding, social security, workers' compensation, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body or payable under any tax-sharing agreement or any other Contract.

1.95  "Tax Return" shall mean any return (including any information return), report, statement, schedule, notice, form, declaration, claim for refund or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

1.96  "Third Party" shall mean a Person that is not a party to this Agreement.

1.97  "Third-Party Claim" shall mean any claim against any Indemnified Person by a Third Party, whether or not involving a Proceeding.

1.98  "Title Insurance Policy" shall have the meaning set forth in Section 2.6 hereof.

1.99  "Title Objections" shall have the meaning set forth in Section 2.6 hereof.

1.100  "Trade Secrets" shall have the meaning set forth in Section 4.22 hereof.

1.101  "Transactions" shall mean the filing of the Sale Motion, entry of the Sale Order and completion of the Closing, and all other transactions contemplated under this Agreement.

1.102  "UCC Reports" shall mean (a) the UCC Search Report issued by the Nevada Secretary of State dated as of October 9, 2001, and (b) the UCC Search Report issued by Associated Title Company dated as of September 6, 2001, collectively.

1.103  "Utah Code" shall mean the Utah Code, as amended.

1.104  "WARN Act" shall mean the Federal Worker Adjustment Retraining and Notification Act, as amended.

2.    THE TRANSACTION.

2.1    Sale of Assets. On the Closing Date, Sellers shall sell, transfer, convey, and deliver to Buyers free and clear of all Encumbrances and other exceptions to title other than Permitted Exceptions, in accordance with the terms and conditions described in this Agreement, all of the Assets, excluding only the Excluded Assets.

2.2    Purchase Price. In consideration for the sale of the Assets by Sellers to Buyers and the Covenant of Sellers Not to Compete, Buyers agree to pay to Sellers the

J:\COREL\WPD\

: Thatos Asset Purchase Agreement 3-27-02 ^>:
03/28/2 (Thu) 9:19 am

33    21

sum of (a) Forty-three Million Dollars ($43,000,000), plus (b) the amount of Sellers' Bankroll Funds on hand at the R●●●Property on the Closing Date as ●●ded in Section 2.9 hereof, plus (c) the value of the Inventory on hand at the Real Property on the Closing Date as provided in Section 2.9 hereof (the "Purchase Price").

2.3    Allocation.   The Purchase Price for the Assets shall be allocated by Sellers and Buyers as required by Code Section 1060 based upon the relative fair market values of the respective Assets as agreed upon by Sellers and Buyers prior to expiration of the Due Diligence Period, with the sum of One Thousand Dollars ($1,000) of the Purchase Price being allocated to the Covenant of Sellers Not to Compete.  Sellers shall file Form 8594, Assets Acquisition Statement, under Code Section 1060 after the Closing Date when required under the Code, and Sellers and Buyers agree to satisfy any and all other reporting requirements of Code Section 1060 and the Treasury Regulations thereunder. Such Forms 8594 shall be filed in a manner consistent with the allocation of the Purchase Price as agreed by the parties as set forth above.

2.4    Terms of Payment.  The Purchase Price shall be paid by Buyers to Sellers as hereafter provided.

2.4.1   Credit for Assumed Liabilities.   At the Closing, Buyers shall assume or take the Assets subject to the Assumed Liabilities and the sum, if any, of the unpaid balances of the Assumed Liabilities as of the Closing Date shall be applied as a credit against the balance of the Purchase Price due from Buyers at Closing.  The parties shall determine and verify the actual balances due under the Assumed Liabilities on the Closing Date based upon the procedures set forth in Section 6.8 hereof and the sum of said balances, if any, shall be credited as a payment towards the Purchase Price on the Closing Date.

2.4.2   Balance of Purchase Price.  The balance of the Purchase Price after deduction of (a) the amount of the Assumed Liabilities as of the Closing Date as set forth in Section 2.4.1, and (b) the sum of One Million, Five Hundred Thousand Dollars ($1,500,000) (the "Post Closing Escrow Amount") shall be paid by Buyers by wire transfer to the Escrow Agent or pursuant to the Sale Motion and Sale Order (as such are approved by Buyers hereunder) at the Closing Date.  Sellers acknowledge that, due to time constraints, Sellers and Buyers may not be able to determine the amount of Inventory and Bankroll Funds prior to the Closing.  Accordingly, the amount of Purchase Price payable for Inventory and Bankroll Funds shall be payable immediately upon Buyers' and Sellers' determination of the amounts thereof as provided in Section 2.9 hereof.  Buyers shall deliver the Post Closing Escrow Amount by wire transfer to the post closing escrow account established under the Post Closing Escrow Agreement pursuant to Section 2.5 hereof.

2.5    Post Closing Escrow Agreement.  A post closing escrow account shall be established pursuant to the terms of an escrow agreement among Sellers, Buyers, the parties to the Ancillary Real Property Purchase Agreements, and Escrow Agent in substantially the form attached hereto as Exhibit 2.5 (the "Post Closing Escrow Agreement") and the Post Closing Escrow Amount shall be deposited thereunder.  The escrow account so established sh●●  ●●n a segregated escrow ac●●●unt established under

14.

the Post Closing Escrow Agreement at a bank mutually agreed upon by the parties prior to the Closing. The post closing escrow shall be for a one and one-half (1.5) year term, at which time all funds then held in the post closing escrow account shall be released to Sellers, other than funds which are subject to a claim or claims for indemnification, which funds shall be released at the time of, and in accordance with, the resolution of such indemnification claim or claims. The Post Closing Escrow Agreement shall further provide that at such time as Sellers comply with the provisions of Sections 12.7 and 12.8 hereof or otherwise provide an order of the Bankruptcy Court or other evidence acceptable to Buyers, in Buyers' reasonable discretion, that Buyers have no Liability with respect to the Taxes and other items referred to in Sections 12.7 and 12.8 hereof, the sum of Five Hundred Thousand Dollars ($500,000) of the Post Closing Escrow Amount shall be disbursed to Sellers. At the end of the one and one-half (1.5) year term the balance of funds remaining in the post closing escrow account in excess of funds then subject to claims for indemnification shall be disbursed to Sellers.

2.6    <u>Title and Possession</u>. At the Closing, Sellers shall convey title to the Assets to Buyers by delivery of the Deeds, Bills of Sale, Assignments, Assignment and Assumption Agreement, and such other documents and instruments reasonably required by Buyers to transfer the Assets pursuant to this Agreement. Prior to Closing, Buyers shall designate which Buyer shall take title to the various Assets, it being contemplated that Wendover Commercial Properties, Inc. shall take title to the Assets comprising Real Property situated in the State of Utah. Possession of the Assets shall be transferred to Buyers on the Closing Date. Title to the Assets shall be conveyed subject only to the following Encumbrances and other title exceptions (the "Permitted Exceptions").

(A)    The lien of non-delinquent general and special city and county real and personal property taxes and assessments for the fiscal year in which escrow closes.

(B)    Such easements, rights-of-way, encroachments, covenants, conditions or restrictions and other matters as disclosed by the Preliminary Title Reports and UCC Reports which are approved by Buyers in accordance with the provisions of this Section 2.6. Within five (5) days after the Effective Date, Sellers shall provide Buyers with the Preliminary Title Reports and with conformed copies of all exceptions and items of record referred to in the Preliminary Title Reports and UCC Reports. On or before the expiration of the Due Diligence Period, Buyers shall notify Sellers of any items or exceptions which are unacceptable to Buyers in Buyers' sole and absolute discretion shown in the Preliminary Title Reports and UCC Reports ("Title Objections") which are not set forth in paragraph (A) above. Failure by Buyers to so notify Sellers of any Title Objections on or before expiration of the Due Diligence Period shall constitute Buyers' disapproval of all items shown in the Preliminary Title Reports and UCC Reports (such that all such items shall constitute Title Objections). The following shall apply to all Title Objections:

(1)    Sellers may, within five (5) days after expiration of the Due Diligence Period, remove all such Title Objections at Sellers' sole cost and expense;

(2)    If Sellers are unable or unwilling to remove all such Title Objections, Sellers shall so notify ?    ers in writing prior to the date five (5) days after the

15.

expiration of the Due Diligence Period. In the event Sellers shall so notify Buyers, Buyers shall have the right to either (i) waive the Title Objection and purchase the Assets subject to such unacceptable item(s) or exception(s), or (ii) terminate its obligation to purchase the Assets by giving written notice of cancellation to Sellers as provided in Section 10.1 hereof. Failure by Sellers to notify Buyers in writing of any Title Objections which they are unwilling or unable to remove will constitute Sellers' agreement to remove the same on or before the Closing.

Notwithstanding the foregoing, any and all Encumbrances securing monetary obligations shall constitute Title Objections regardless of whether Buyers object thereto and the Assets shall be conveyed by Sellers free and clear of such Encumbrances under the Sale Order as a condition to Buyers' obligations at Closing. An ALTA extended coverage owner's policy of title insurance in a form and including such indorsements as are required by Buyers in Buyers' sole and absolute discretion (the "Title Insurance Policy") shall be issued by Escrow Agent at the Closing insuring title to the Real Property vested in Buyers subject only to the Permitted Exceptions. The Title Insurance Policy shall be issued in the face amount of the Purchase Price of the Assets allocated to the Real Property as set forth in Section 2.3 hereof.

2.7    Liabilities; Discharge. Except for the assumption of (a) Sellers' obligations under the Contracts described on Exhibit 2.7 (collectively, the "Assigned Contracts") which accrue from and after the Closing Date, and (b) the Progressive Slot Liability, as such obligation exists on the Closing Date (collectively, the "Assumed Liabilities"), Buyers, by entering into this Agreement and consummating the Transactions is not assuming, agreeing to pay, become liable for, or take subject to, any Liability of any Sellers or Owners or any of them or any Encumbrance of any type or nature whatsoever, and except as aforesaid Buyers shall not assume any such Liability nor shall Buyers become liable for any such Liability. Without limiting the generality of the foregoing, Buyers shall not assume (i) any Liability for any litigation matter or any Third-party Claim arising from the conduct of the Businesses or ownership of the Assets prior to the Closing Date, regardless of whether such matters are disclosed on the Disclosure Letter; (ii) any Liability for any legal fees or expenses for any of Sellers or Owners incurred for any reason whatsoever; (iii) any Liability for any claims of employees or former employees of any of Sellers for any reason whatsoever; (iv) any Liability for any insurance premium adjustments (including retroactive adjustments) that may arise from insurance policies in force any time before the Closing Date; or (v) any Liability of any of Sellers or Owners for any Taxes or for any employee benefit obligations. The Sale Order shall provide that (I) the Assets shall be sold to Buyers free and clear of all Liabilities of Sellers and Encumbrances including, without limitation, all Liabilities and Encumbrances related to Taxes, all of Sellers' employees, directors, independent contractors, consultants and agents, Liabilities in any way related to Hazardous Materials or Environmental Laws, Liabilities in any way related to Sellers' Plans, Liabilities in any way related to ERISA, or any other Third-party Claims or Liabilities, and all Encumbrances encumbering or otherwise affecting any of the Assets, and that neither Buyers (nor any Affiliate) shall assume or retain any Liabilities or other obligation in connection with the Assets, the Businesses, or otherwise in any way related to Sellers except the Assumed Liabilities, and (II) that all Assets shall be sold to Buyers free and clear of all Third party Claims, Liabilities, and Incumbrances of any kind nature whatsoever.

The amount of the Progressive Slot Liability shall be determined by a meter reading taken by Sellers and Buyers ⬤ he Closing Date.

2.8   Accounts Receivable. All of Sellers' accounts receivable on the Closing Date shall constitute Excluded Assets and remain the property of Sellers as specified in Section 2.1 above. Sellers shall be responsible for collecting all of their accounts receivable. Following the Closing, Buyers shall promptly remit to Sellers any of Sellers' accounts receivable received by Buyers which are attributable to Sellers' ownership and operation of the Assets prior to the Closing. Buyers shall have no Liability to Sellers as a result of the failure by Buyers to collect any of Sellers' accounts receivable.

2.9   Bankroll Funds and Inventory. Sellers and Buyers shall determine the total amount of the Bankroll Funds at the Real Property immediately prior to the Closing by agreed upon count. The amount of Inventory shall be determined by a physical inventory taken by representatives of Sellers and Buyers immediately prior to the Closing and Inventory items shall be based upon Sellers' current costs. Sellers' current cost of each item of Inventory shall be determined based upon the most recent invoice actually paid by Sellers prior to the Closing Date. All such Bankroll Funds and Inventory shall be transferred and delivered to Buyers at Closing.

2.10   Promotions; Customer Deposits; Wagers. Buyers understand that Sellers, in the normal course of the Businesses, have conducted special events with promotions designed to attract customers which involve the issuance of discount or other customer entitlement coupons, received deposits made by customers of its hotels, issued hotel vouchers, committed to pay travel agent commissions, received wagers on events by customers, and received deposits on wagers by customers. Sellers have set forth a complete description of all special events and promotions conducted by Sellers, and all of the other foregoing items in Part 4.23. To the extent possible, Buyers agree to accept and honor all such valid and unexpired promotional, discount or entitlement coupons, deposits, vouchers, commissions, and wagers tendered to Buyers at the Real Property within One Hundred Twenty (120) days after the Closing; provided, however, Sellers shall indemnify and hold Buyers harmless from all costs and expenses incurred in connection with any promotions, discounts, coupons, deposits, vouchers, commissions, and wagers which were issued prior to the Closing but redeemed or paid subsequent thereto. In this regard, Sellers shall be responsible for paying to Buyers the full amount of any such items redeemed or paid within thirty (30) days after the date in which such promotional, discounts, coupons, deposits, vouchers, commissions, and wagers are redeemed or negotiated. Buyers, at its election, may use the funds held pursuant to the Post Closing Escrow Agreement to reimburse Buyers for the cost of all such items.

2.11   Gaming Chips and Tokens. Sellers' gaming chips and tokens shall be an Excluded Asset. Sellers shall remain responsible for the cost of redeeming all of Sellers' gaming chips and tokens in accordance with all applicable Legal Requirements. Buyers agree to accept Sellers' gaming chips and tokens for a period of one hundred twenty (120) days after the Closing at the business conducted on the Real Property; provided, however, Sellers agree to indemnify and hold Buyers harmless from all costs and expenses incurred by Buyer connection with the redem tion of said gaming chip nd tokens. In this

regard, Sellers agree to pay Buyers the full value of Sellers' gaming chips and tokens redeemed by Buyers w    thirty (30) days after they are re    ned. Buyers may, at their election, withdraw funds held under the Post Closing Escrow Agreement to reimburse Buyers for the costs and expenses incurred in connection with redeeming Sellers' gaming chips and tokens.

2.12    Fees and Expenses. Notwithstanding any other conflicting or inconsistent provision of this Agreement, Sellers and Buyers agree that if the Transactions are not consummated because another offer for the Assets (or another form of offer the effect of which is to prevent Buyers from consummating the Transactions contemplated herein) is accepted and approved by the Bankruptcy Court (a "Competing Transaction"), then in such event Sellers shall pay, subject to the approval of the Bankruptcy Court, a fee (the "Break-Up Fee") to Buyers Two Million Dollars ($2,000,000).    In the case of a Competing Transaction, if not paid earlier, the Break-Up Fee will be paid from and at the time Sellers receive the first proceeds of the sale in the Competing Transaction.    In the event a Competing Transaction is approved but not consummated, Buyers shall be deemed the successful purchaser pursuant to the terms of this Agreement and to the extent received, shall return to Sellers the Break-Up Fee. Attached hereto as Exhibit 2.12 are the bidding procedures (the "Bidding Procedures"), subject to Bankruptcy Court approval, to be adhered to by Sellers in connection with any Competing Transaction, including, without limitation, minimum and incremental overbid levels.    Once this Agreement has been approved by the Bankruptcy Court, if the Transactions are not consummated for any reason (including, without limitation, a Competing Transaction) other than (a) Buyers' Breach, or (b) Buyers' cancellation pursuant to the last sentence of Section 3. hereof, then Sellers shall immediately pay to Buyers the Expenses. Within five (5) days of the Effective Date, Sellers will file with the Bankruptcy Court the Sale Motion to approve payment of the Expenses and the Break-Up Fee, to approve the Bidding Procedures and to approve this Agreement in accordance with the terms hereof subject to overbid by a Competing Transaction, such Sale Motion to be in a form and content reasonably acceptable to Buyers and meeting the other requirements of this Agreement.

3.    CONDITION AND INSPECTION OF ASSETS; FINANCING. Buyers shall have the period of time during the Due Diligence Period to perform such inspections, surveys, environmental investigations, soil analyses, feasibility and financial analyses and investigations, and other tests and studies on the Assets, and to obtain one (1) or more commitments from Third Parties for financing all or such portions of the Purchase Price as Buyers, in Buyers' sole and absolute discretion, shall require for the purpose of determining the suitability of the Assets for Buyers' intended use and the availability of terms for such financing. Without limiting the generality of the foregoing, Buyers (and Persons authorized by Buyers) shall have the right and authority to go on the Real Property from time to time for conducting such analyses and investigations, including but not limited to: (a) preparing and reviewing an ALTA survey of the Real Property; (b) reviewing the status of title to the Assets as disclosed by the Preliminary Title Reports, the UCC Reports, and the ALTA survey; (c) reviewing such engineering reports and other studies and tests of the Real Property as Buyers, in Buyers' sole discretion, may require; (d) obtaining and reviewing a Phase I Environmental Report on the Real Property and, if such Report indicates the possibility of the presence of any Hazardous Materials on, in, or under any

portion of the Real Property, perform such Phase II environmental testing as may be deemed appropriate in ⬤yers' sole and absolute discretio⬤) determining the status of compliance of the Improvements with all applicable Legal Requirements and determining the costs of bringing the Improvements into compliance therewith; (f) reviewing all Sellers' Records and the Assigned Contracts; and (g) reviewing and inspecting the physical condition of the Assets. Sellers agree to (i) fully cooperate with Buyers in connection with the tests, investigations and inspections of the Assets, and (ii) within five (5) days after the Effective Date, furnish Buyers with copies of any and all structural reports, construction warranties, operating statements, Financial Statements and gaming and other reports, environmental reports, boundary and topographic surveys, soils and engineering studies and reports, governmental zoning letters, plans and construction specifications for the Improvements, certificates of occupancy, parcel maps, permits and licenses, maintenance logs, and Contracts relating to the Assets and/or Businesses in Sellers' possession or otherwise reasonably available to Sellers. Prior to commencing any invasive tests or investigations on the Real Property, such as soil, water, or other sampling, testing, analyses, or drilling or boring, Buyers shall notify Sellers. Buyers' inspection and investigation of the Assets shall be at the sole cost and expense of Buyers, except as otherwise expressly provided herein. Buyers shall exercise commercially reasonable efforts in connection with its inspection and investigation of such Assets in order to reasonably avoid any damage to the Assets and any disruption of the Businesses of Sellers. Buyers agree to leave the Assets in substantially the same condition and further agrees to (a) indemnify and hold Sellers harmless from any claims or demands that may be made by the Buyers or any third party against Sellers by virtue of the privilege of access extended hereunder, and (b) reimburse Sellers for physical Damages caused to the Equipment or Real Property by Buyers or their agents, employees, representatives, or contractors in connection with its investigations, each except as to claims or Damages that arise out of the negligence or intentional act or omissions of Sellers or Sellers' employees, agents, representatives, or contractors. If Buyers determine, in Buyers' sole and absolute discretion, that for any reason whatsoever or for no reason the Assets are not suitable for Buyers' acquisition, then Buyers may cancel this Agreement by giving written notice to Sellers not later than the expiration of the Due Diligence Period.

4.    REPRESENTATIONS AND WARRANTIES OF SELLERS. Sellers and represent and warrant, each jointly and severally, to Buyers as follows:

4.1    Organization and Good Standing.

4.1.1  Part 4.1 contains a complete and accurate list of each of Sellers' jurisdictions of organization and any other jurisdictions in which each of Sellers is qualified to do business as a foreign entity. Each Seller is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with full power and authority to conduct the Businesses as now being conducted, to own or use the Assets and to perform all their obligations under this Agreement and the Assigned Contracts.

4.1.2  Complete and accurate copies of the Governing Documents of each Seller, as currently in effect, are attached as part of Part 4.1.

4.1.3  Sellers have no Subsidiaries and, except as disclosed in Part 4.1, do not own any shares of ⬤tal stock, securities, or other ow⬤hip interests of any other Person.

4.2    Enforceability; Authority; No Conflict.

4.2.1  Subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid and binding obligation of each Seller, enforceable against each of them in accordance with its terms. Upon the execution and delivery by Sellers of the Post Closing Escrow Agreement, the Assignment and Assumption Agreement, the Assignments, the Bills of Sale, and the Deeds, and each other agreement, document, or instrument to be executed or delivered by any or all of Sellers at the Closing, each of such documents, instruments, and agreements will constitute the legal, valid and binding obligation of each Seller and Owner, enforceable against each of them in accordance with their respective terms. Subject to Bankruptcy Court approval, each Seller and Owner has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the documents, instruments, and agreements to be delivered at Closing  to which it is a party and to perform its obligations under this Agreement and the documents, instruments, and agreements to be delivered at Closing, and such action has been duly authorized by all necessary action by Sellers and Owners. Each Owner has all necessary legal capacity to enter into the documents, instruments, and agreements to be delivered at Closing to which such Owner is a party and to perform its respective obligations hereunder and thereunder.

4.2.2  Except as set forth in Part 4.2, neither the execution and delivery of this Agreement nor the consummation or performance of any of the Transactions will, directly or indirectly (with or without notice or lapse of time): (i) Breach (I) any provision of any of the Governing Documents of Sellers, or (II) any resolution adopted by Sellers, (ii) Breach or give any Governmental Body or other Person the right to challenge any of the Transactions or to exercise any remedy or obtain any relief under any Legal Requirement or any Order to which any of Sellers, or any of the Assets may be subject; (iii) contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Sellers or that otherwise relates to the Assets or to the Businesses; (iv) cause Buyers to become subject to, or to become liable for the payment of, any Tax; (v) Breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Contract of Sellers; or (vi) result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

4.2.3  Except as set forth in Part 4.2, none of Sellers or Owners are required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Transactions.

4.3    Financial Statements, Gaming Reports, Bankruptcy Court Filings and Banks' Information.  Sellers have delivered or will deliver to Buyers through the Closing:  (a) the

audited balance sheets of each Seller as of December 31, 1998, 1999, and 2000 and the related audited statem● of income, changes in shareho● equity and cash flows for the fiscal years then en●ed, including in each case the notes thereto, together with the report thereon of Hansen, Barnett & Maxwell CPA's; (b) an unaudited balance sheet of each Seller as of December 31, 2001 and the related unaudited statement[s] of income, changes in shareholders' equity, and cash flows for the calendar year then ended, including in each case the notes thereto, certified by Sellers' chief financial officer, (c) true and correct copies of all gaming compliance and other reports filed with the Nevada Gaming Authorities since December 31, 1997 and to be filed through the Closing; (d) all filings made and to be made with the Bankruptcy Court through the Closing; and (e) all reports, agreements with, and other information provided and to be provided to the Banks through the Closing. The financial statements provided to Buyers pursuant to this Section 4.3 and elsewhere in this Agreement are hereafter referred to collectively as the "Financial Statements." The Financial Statements fairly present the financial condition and the results of operations, changes in equity and cash flows of each Seller as of the respective dates of and for the periods referred to in such Financial Statements, all in accordance with GAAP. The Financial Statements reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to the Financial Statements. The Financial Statements have been prepared from and are in accordance with the accounting Records of Sellers. Sellers have also delivered or will deliver pursuant to Article 3. hereof to Buyers copies of (i) all letters from Sellers' auditors to Sellers, and (ii) all correspondence from and to Nevada Gaming Authorities during the thirty-six (36) months preceding the Effective Date, together with copies of all responses thereto.

4.4    Books and Records. The books of account and other financial Records of Sellers, all of which have been or will, during the Due Diligence Period, be made available to Buyers, are complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices and all legal requirements, including the maintenance of an adequate system of internal controls. The minute books of Sellers, all of which have been made available to Buyers, contain accurate and complete Records of all meetings held of, and corporate action taken by, the partners, the shareholders, the board of directors and committees of the board of directors of Sellers, and no meeting of any such partners, shareholders, board of directors or committee has been held for which minutes have not been prepared or are not contained in such minute books.

4.5    Sufficiency of Assets. Except as set forth in Part 4.5, the Assets (a) constitute all of the properties and assets, tangible and intangible, of any nature whatsoever, necessary or appropriate to operate the Businesses in the manner presently operated by Sellers, and (b) include all of the operating assets of Sellers. Without limiting the foregoing, the Assets include all water rights, will serve commitments, and other approvals necessary or appropriate to own and operate the Real Property and Businesses as currently being conducted and all other water rights appurtenant to the Real Property.

4.6    Description of Real Property. Exhibit 1.64 contains a correct legal description, street address (if any) and tax parcel identification number of all tracts, parcels and subdivided lots included in the Land.

4.7    Title to Assets; Encumbrances.

4.7.1    Sellers own good and marketable title to their respective estates in the Real Property (collectively in all of the Real Property), and, at Closing, such title shall be conveyed to Buyers free and clear of any Encumbrances other than the Permitted Exceptions. Sellers represent and warrant to Buyers that, on the Closing Date, the Real Property shall be conveyed to Buyers free and clear of all Encumbrances other than the Permitted Exceptions.

4.7.2    Sellers own good and marketable title to all of the other Assets and, at Closing, such title shall be conveyed to Buyers free and clear of any Encumbrances other than the Permitted Exceptions. Sellers represent and warrant to Buyers that, on the Closing Date, all other Assets shall be conveyed to Buyers free and clear of all Encumbrances other than the Permitted Exceptions.

4.8    Condition of Assets.

4.8.1    Use of the Real Property for the various purposes for which it is presently being used is permitted under all applicable zoning Legal Requirements and is not subject to "permitted nonconforming" use or structure classifications.    Except as disclosed in Part 4.8.1, all Improvements are in compliance with all applicable Legal Requirements, including those pertaining to zoning, special uses, environmental, safety, building and the disabled, are in good repair and in good condition, ordinary wear and tear excepted, and are free from latent and patent defects. No part of any Improvement encroaches on any real property not included in the Real Property, and there are no buildings, structures, fixtures or other Improvements situated on adjoining property which encroach on any part of the Real Property. All of the Land constitutes one (1) or more legal parcels of land capable of being conveyed to Buyers in conformance with all Legal Requirements, abuts on and has direct vehicular access to a public road or has access to a public road via a permanent, irrevocable, appurtenant easement benefitting such Land and comprising a part of the Real Property, is supplied with public or quasi-public utilities and other services appropriate for the operation of the Improvements located thereon and is not located within any flood plain or area subject to wetlands regulation or any similar restriction. To Sellers' Knowledge, there is no existing or proposed plan to modify or realign any street or highway or any existing or proposed eminent domain proceeding that would result in the taking of all or any part of any facility or that would prevent or hinder the continued use of any facility as heretofore used in the conduct of the Businesses. The Real Property does not contain any fill or compacted soils or any surface or subterranean man-made debris.

4.8.2    Except as disclosed in Part 4.8, each item of tangible personal property included in the Assets is in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use and is free from latent and patent defects. Except as disclosed in Part 4.8, no item of such tangible personal property is in need of repair or replacement other than as part of routine maintenance in the ordinary course of business. Except as disclosed in Part 4.8, all such tangible personal property used in the Businesses is in the possession of Sellers.

4.9    Supplies.  All items included in the Supplies consist of a quality and quantity usable and saleable, ⬤ e ordinary course of business ⬤ ellers.  Sellers are not in possession of any Supplies not owned by Sellers.

4.10    No Undisclosed Liabilities.  Except as set forth in Part 4.10, Sellers have no Liabilities except for Liabilities reflected or reserved against in the Financial Statements and current Liabilities incurred in the ordinary course of business of Sellers since December 31, 2001.

4.11    Taxes.

4.11.1    Taxes Paid.  Buyers shall incur no Liability as a result of the consummation of the Transactions resulting from, or in any way related to, any obligation to pay any Taxes of or by Sellers, Owners, or any of them.

4.11.2    Delivery of Tax Returns.  Sellers have delivered or made available to Buyers copies of, and Part 4.11 contains a complete and accurate list of, all Tax Returns filed since December 31, 1997. The federal and state income or franchise Tax Returns of Sellers have been audited by the IRS or relevant state tax authorities or are closed by the applicable statute of limitations for all taxable years through 1998. Part 4.11 contains a complete and accurate list of all Tax Returns of Sellers that have been audited or are currently under audit and accurately describe any deficiencies or other amounts that were paid or are currently being contested.

4.11.3    Occasional Sale Exemption.  The Transactions qualify as an "occasional sale" under NRS Chapters 372, 374 and 377 and no sales Tax will be incurred as a result of this Transaction.

4.12    Compliance with Legal Requirements; Governmental Authorizations.

4.12.1    Except as set forth in Part 4.12: (1) Sellers are, and at all times since December 31, 2000, have been, in full compliance with each Legal Requirement that is or was applicable to them or to the conduct or operation of the Businesses or the ownership or use of any of the Assets; (i) no event has occurred or circumstance exists that (with or without notice or lapse of time) (I) may constitute or result in a violation by Sellers of, or a failure on the part of Sellers to comply with, any Legal Requirement or (II) may give rise to any obligation on the part of Sellers to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and (ii) Sellers have not received, at any time since December 31, 2000, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (I) any actual, alleged, possible or potential violation of, or failure to comply with, any Legal Requirement or (II) any actual, alleged, possible or potential obligation on the part of Sellers to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.  Sellers and Owners do not otherwise have Knowledge of violation, of any Legal Requirement relating to the Assets or Businesses.  Without limiting the foregoing, all of the Real Property complies with the Nevada Subdivision Map Act and comparable requirements under Utah law.

4.12.2      Part 4.12 contains a complete and accurate list of each Governmental Authorization that is held by Sellers or otherwise relates to the Businesses or the Assets. Each Governmental Authorization listed or required to be listed in Part 4.12 is valid and in full force and effect. Except as set forth in Part 4.12: (1) Sellers are, and at all times since December 31, 2000, have been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 4.12; (i) no event has occurred or circumstance exists that may (with or without notice or lapse of time) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 4.12 directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 4.12; (ii) Sellers have not received, at any time since December 31, 2000, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (I) any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Governmental Authorization or (II) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Governmental Authorization; and (iii) all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 4.12 have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies. The Governmental Authorizations listed in Part 4.12 collectively constitute all of the Governmental Authorizations necessary to permit Sellers to lawfully conduct and operate the Businesses in the manner in which they currently conduct and operate the Businesses and to permit Sellers to own and use the Assets in the manner in which they currently own and use the Assets.

4.13   Absence of Changes.  Since December 31, 2000, Sellers have not, except as specifically disclosed on Part 4.13 or with respect to the Excluded Assets:

4.13.1      Transferred, assigned or conveyed any of its assets or business or entered into any transaction or incurred any liability or obligation, other than in the ordinary course of its business and consistent with past practice;

4.13.2      Suffered any destruction, damage or loss to property (casualty or other), reasonable and ordinary wear and tear excepted, whether or not covered by insurance;

4.13.3      Made or agreed to any material adverse change in the terms of any Assigned Contract;

4.13.4      (1) Disposed of or permitted to lapse, or otherwise failed to preserve then existing exclusive rights, if any, of any of Sellers to use any (I) patent, trademark, trademark registration, logo, assumed name, trade name, copyright or copyright registration, or (II) patent, trademark, trade name or copyright application, (i) disposed of

or permitted to lapse any Governmental Authorization, or any trade name, or (iii) disposed of or disclosed to any person any trade secret;

4.13.5    Made any change in any method of accounting or accounting practice;

4.13.6    Paid, loaned or advanced any amount to or in respect of, or sold, transferred or leased any properties or assets (whether real, personal, mixed, tangible or intangible) to, or entered into any agreement, arrangement or transaction with, any Owner, any of the officers or directors of any of Sellers, or any Affiliate of any of them, or any business or entity in which any Owner or any of Sellers or any Affiliate of any of them has any direct or indirect interest, except for compensation to the officers and employees of Sellers at rates not exceeding the rates of compensation in effect as of December 31, 2000, except as such compensation rates may be increased in the ordinary course of business;

4.13.7    Entered into any lease of real property or lease of personal property requiring payments in excess of Ten Thousand Dollars ($10,000) per year;

4.13.8    Incurred any other Liability or entered into any transaction other than in the ordinary course of business; or

4.13.9    Agreed, whether in writing or otherwise, to take any action described in this Section 4.13.

4.14    Proceedings.    Except as otherwise set forth in Part 4.14, there is no Proceeding pending or threatened against or affecting any of Sellers. There exists no basis or grounds for any such Proceeding. None of the items described in Part 4.14, singly or in the aggregate, if pursued and/or resulting in a judgment or decision against any of Sellers would have a material adverse effect on the Assets, Businesses or financial condition of any of Sellers or the ability of any party to consummate the Transactions.

4.15    Contracts, Etc.    Part 4.15 consists of a true, correct and complete list of all Contracts to which any of Sellers is a party other than the Excluded Assets. Sellers have made available a true and complete copy of each such Contract or a summary of oral agreements to which any of Sellers is a party. Except as specifically set forth and in detail described in Part 4.15, none of Sellers is a party or subject to, whether oral or written, any of the following:

4.15.1    Any Contract or commitment which requires services to be provided or performed by any of Sellers or which authorizes others to perform services for, through or on behalf of any of Sellers;

4.15.2    Any Contract or commitment involving an obligation which cannot be performed or terminated within thirty (30) days from the dates as of which these representations are made;

J:\COREL\WPDATA\RAY\                         ...sset Purchase Agreement 3-27-02 wpd
03/28/2 (Thu) 9:19am

4.15.3    Any lease, rental agreement or other Contract or commitment affecting the ownership or leasing of, title to or use of an interest in real or personal property;

4.15.4    Any Contract or commitment which is outside of the normal, ordinary and usual requirements of its Businesses;

4.15.5    Any franchise agreement;

4.15.6    Any instrument or arrangement evidencing or related to indebtedness for money borrowed or to be borrowed, whether directly or indirectly, by way of purchase money obligation, guaranty, subordination, conditional sale, lease-purchase, or otherwise;

4.15.7    Any Contract with any labor organization;

4.15.8    Any policy of life, fire, liability, medical or other form of insurance other than included in the Excluded Assets;

4.15.9    Any Order or Consent of any Governmental Body required to conduct the Businesses; or

4.15.10    Any Contract not of the type covered by any of the other items of this Section 4.15, which is not in the ordinary course of business or which has a material adverse impact on the Business or Assets.

All of such Contracts are valid and binding upon the applicable Sellers and the other parties thereto, and are in full force and effect and constitute legal, valid and binding obligations of the respective parties thereto, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, applicable equitable principles or similar laws from time to time in effect affecting the enforcement of creditors' rights generally, and except as set forth in Part 4.15, none of Sellers has, and to Sellers' Knowledge, no other party to any such Contract has Breached any material provision of, or is in default in any material respect (including any event or condition which, with notice or lapse of time, or both, would constitute a default) under, the terms thereof. Subject to Bankruptcy Court approval of Sellers' assumption and assignment of the Assigned Contracts to Buyers, no Consent of any other party to any of such Contracts to the consummation of the Transactions is required for any of such Contracts to remain in full force and effect following the Closing except as described in Part 4.15.

4.16    Labor Matters. Except as disclosed in Part 4.16, within the last three (3) years, none of Sellers has been the subject of any union activity or labor dispute, nor has there been any strike of any kind called, or threatened to be called against it, and it has not violated any applicable federal or state law, rule or regulation relating to labor or labor practices, including without limitation employment discrimination laws relating to age, gender, ethnicity or minority status or sexual preference, and is not a party to any collective

:\COREL\WPDATA\RAW\Peppermill Casinos\As+~    ~~~~~tt 3-27-02 w>~
'~~) 9:19am

bargaining agreement.  None of Sellers is bound by or subject to any labor agreement, union agreement or collective bargaining agreement.

### 4.17   ERISA and Related Matters.

4.17.1  The term "Plan" shall include each bonus, deferred compensation, incentive compensation, stock purchase, stock option, severance or termination pay, hospitalization and other medical, life and other insurance pension or retirement, profit sharing, stock appreciation rights, supplemental unemployment, layoff, consulting, fringe benefit including, but not limited to, vacation, paid holidays, personal leave, or any similar plan, program, agreement, arrangement, payroll procedure, policy or understanding (other than arrangements involving the timing of payment of wages) sponsored, maintained or contributed to by any of Sellers or by any trade or business, whether or not incorporated, that together with any of Sellers would be deemed a "single employer" within the meaning of ERISA Section 4001(a)(14) for the benefit of any current or former employee, director, or independent contractor of any of Sellers whether formal or informal and whether legally binding or not with respect to which any of Sellers or any ERISA Affiliate has or may in the future have any liability or obligation to contribute or make payments of any kind.

4.17.2  Part 4.17 contains a true and complete list of each Plan.  Sellers have heretofore made available to Buyers correct and complete copies of each of the Plans.  At the Closing, the Assets shall be conveyed to Buyers free and clear of any Encumbrances imposed under ERISA or the Code.

4.17.3  None of Sellers nor any ERISA Affiliate is contributing to, is required to contribute to, or has contributed within the last six (6) years to, any Multi-employer Plan, and none of Sellers nor any ERISA Affiliate has incurred within the last six (6) years, or reasonably expects to incur, any "withdrawal liability," as defined under Section 4201 et seq. of ERISA.

4.17.4  Except as described in Part 4.17 with respect to each Plan, no condition or event exists or is expected to occur that could subject, directly or indirectly, Buyers to any Liability, contingent or otherwise, or the imposition of any Encumbrance on the Assets or any ERISA Affiliate of Buyers under the Code or Title IV of ERISA whether to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, or any other Person.

4.17.5  Except as disclosed on Part 4.17, neither the execution and delivery of this Agreement nor the consummation of the Transactions hereby will result in any payment (including, without limitation, severance, or unemployment compensation) becoming due to any employee of Sellers by Buyers.

4.18   Insurance.  Except with respect to the Excluded Assets, Part 4.18 sets forth a complete and accurate list of all insurance Contracts and policies (and their expiration dates), including all policies of fire, liability (including products and environmental liability), workers' compensation, casualty, business interruption and all other forms of insurance owned, held by or maintained by or on behalf of any of Sellers.  Copies of all such

insurance Contracts have been delivered or will be delivered pursuant to Article 3. hereof to Buyers. All such Contracts are valid, outstanding, and enforceable policies, provide insurance coverage typical for the type of business engaged in by Sellers and provide that they will remain in full force and effect through at least the Closing Date. The Liability, workers' compensation and casualty insurance policies extend coverage and insure the Liability associated with each and every Proceeding, claim or investigation listed on Part 4.18. There presently are no claims outstanding, nor, to the best of Seller's Knowledge, any basis therefor, under any of the policies listed on Part 4.18, except as disclosed on Part 4.18. Part 4.18 includes a schedule setting forth the claims and loss history of Sellers for the three (3) years prior to Closing under all policies of worker's compensation insurance, employers' liability insurance, general liability insurance and automobile liability insurance and property insurance.

4.19    Consents; No Violations.  Except as set forth in Part 4.19, no filing or registration with, and except for Bankruptcy Court and Nevada Gaming Authorities approval of this Agreement, no Consent or Order of any Governmental Body or other Person is required by any Legal Requirement or by any applicable Order of any Governmental Body or under any Contract to permit Sellers to execute, deliver or perform this Agreement or any document, instrument or agreement required to be executed by such party at or prior to the Closing. Except as set forth on Part 4.19, the execution and delivery of this Agreement by Sellers does not, and the consummation of the Transactions will not, violate any provision of the Governing Documents of any of Sellers or violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any Contract of Sellers or any Order or other arrangement to which any of Sellers are a party or by which any is bound or the Assets are affected.

4.20    Environmental Matters.  Except as disclosed in Part 4.20:

4.20.1        Sellers and the Real Property are in full compliance with, and have not been and are not in violation of or liable under, any Environmental Law. None of Sellers has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or threatened Order, notice or other communication from (i) any Governmental Body or private citizen acting in the public interest or (ii) or prior owner or operator of any of the Real Property, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake or bear the cost of any environmental, health or safety Liability with respect to any of the Real Property.

4.20.2        There are no pending or, to the Knowledge of Sellers, threatened claims, Encumbrances, or other restrictions of any nature arising under or pursuant to any Environmental Law with respect to or affecting any of the Real Property.

4.20.3        None of Sellers has any Knowledge of or any basis to expect, nor has any of them, or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning or other communication that relates to Hazardous Materials or any alleged, actual, or potential

violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to ⬤ ertake or bear the cost of any e⬤ nmental, health or safety liabilities with respect t⬤ ny of the Real Property.

        4.20.4      None of Sellers nor any other Person for whose conduct any is or may be held responsible has any environmental, health or safety liabilities with respect to any or the Real Property or, to the Knowledge of Sellers, with respect to any property geologically or hydrologically adjoining any of the Real Property or any such other property or asset.

        4.20.5      There are no Hazardous Materials present on, in, or under any portion of the Real Property or to the Knowledge of Sellers, at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, aboveground or underground storage tanks, landfills, land deposits, dumps, equipment (whether movable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Real Property or such adjoining property, or incorporated into any structure therein or thereon.

        4.20.6      There has been no release or, to the Knowledge of Sellers, threat of release, of any Hazardous Materials at or from any portion of the Real Property or at any other location where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by any portion of the Real Property, or to the Knowledge of Sellers any geologically or hydrologically adjoining property, whether by any of Sellers or any other Person.

        4.20.7      Sellers have delivered or will deliver in accordance with Article 3. hereof to Buyers true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Sellers pertaining to Hazardous Materials in, on, or under any portion of the Real Property or concerning compliance, by Sellers or any other Person for whose conduct any is or may be held responsible, with Environmental Laws.

    4.21   Employees.

        4.21.1      Part 4.21 contains a complete and accurate list of the following information for each employee, director, independent contractor, consultant and agent of each of Sellers, including each employee on leave of absence or layoff status: employer; name; job title; date of hiring or engagement; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since December 31, 2000; sick and vacation leave that is accrued but unused; and service credited for purposes of vesting and eligibility to participate under any Plan, or any other employee or director benefit plan.

        4.21.2      Sellers have not violated the WARN Act or any similar state or local Legal Requirement. During the ninety (90) day period prior to the Effective Date, Sellers have terminated not more than twenty-five (25) employees.

4.21.3      To the Knowledge of Sellers, no officer, director, agent, employee, consultant ⬤ contractor of any of Sellers is bound ⬤ y any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to engage in or continue or perform any conduct, activity, duties or practice relating to the Businesses. No former or current employee of any of Sellers is a party to, or is otherwise bound by, any Contract with Sellers that in any way adversely affected, affects, or will affect the ability of Sellers or Buyers to conduct the Businesses as heretofore carried on by Sellers.

4.22    Intangible Property Assets.

4.22.1      The term "Intangible Property Assets" means all intangible and/or intellectual property owned or licensed (as licensor or licensee) by Sellers in which Sellers have a proprietary interest or otherwise utilized by any of Sellers in connection with the Businesses, including, without limitation, the following: (i) the Business Names, all assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications (collectively, "Marks"); (ii) all patents, patent applications and inventions and discoveries that may be patentable (collectively, "Patents"); (iii) all registered and unregistered copyrights in both published works and unpublished works (collectively, "Copyrights"); (iv) all rights in mask works; (v) all know-how, trade secrets, confidential or proprietary information, customer lists, Software, technical information, data, process technology, plans, drawings and blue prints, including, without limitation, (I) the procedural and operational manuals utilized by Sellers in the operation of the Businesses, (II) all proprietary information, technical information, "know how" and like information utilized by the Sellers in Businesses, and (III) all advertising materials, source documents, materials, supplies and forms, in any case, whether in the form of hard copies, electronic media, computer tape or otherwise (collectively, "Trade Secrets"); and (vi) all rights in internet web sites and internet domain names presently used by Sellers (collectively "Net Names").

4.22.2      Part 4.22 contains a complete and accurate list and summary description, including any royalties paid or received by Sellers, and Sellers have delivered or will deliver pursuant to Article 3. hereof to Buyers accurate and complete copies, of all Contracts relating to the Intangible Property Assets. There are no outstanding and, to Sellers' Knowledge, no threatened disputes or disagreements with respect to any such Contract.

4.22.3      Except as set forth in Part 4.22, the Intangible Property Assets are all those necessary for the operation of the Businesses as currently conducted. Sellers are the owner or licensee of all right, title and interest in and to each of the Intangible Property Assets, and, at Closing, Sellers shall convey the Intangible Property Assets to Buyers free and clear of all Encumbrances, and Buyers shall from and after Closing have the right to use without payment to a Third Party all of the Intangible Property Assets, other than in respect of licenses listed in Part 4.22.

4.22.4      None of Sellers owns or utilizes any Patents.

J:\CORE\...ATA\RAW\Peppermill Casinos\Asset Purchase Agreem...   ...F .i2 .PC
03/28/2 (T   8:13am

4.22.5          (i) Part 4.22 contains a complete and accurate list and summary description of all Mark●  ●i) All Marks have been registere●  ●h the United States Patent and Trademark Office and all State Governmental Authorities, and are currently in compliance with all formal Legal Requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable and are not subject to any maintenance fees or taxes or actions falling due within ninety (90) days after the Closing Date. (iii) No Mark has been or is now involved in any opposition, invalidation or cancellation Proceeding and, to Sellers' Knowledge, no such action is threatened with respect to any of the Marks. (iv) To Sellers' Knowledge, there is no potentially interfering trademark or trademark application of any other Person. (v) No Mark is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the Marks used by Sellers infringes or to Sellers' Knowledge is alleged to infringe any trade name, trademark or service mark of any other Person. (vi) All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

4.22.6          (i) Part 4.22 contains a complete and accurate list and summary description of all Copyrights. (ii) All of the registered Copyrights are currently in compliance with formal Legal Requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety (90) days after the date of Closing. (iii) No Copyright is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any Third Party or is a derivative work based upon the work of any other Person. (iv) All works encompassed by the Copyrights have been marked with the proper copyright notice.

4.22.7          (i) With respect to each Trade Secret, the documentation relating to such Trade Secret is current, accurate and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual. (ii) Sellers have taken all reasonable precautions to protect the secrecy, confidentiality and value of all Trade Secrets (including the enforcement by Sellers of a policy requiring each employee or contractor to execute proprietary information and confidentiality agreements and all current and former employees and contractors of Sellers have executed such an agreement). (iii) Sellers have good title to and an absolute right to use the Trade Secrets. The Trade Secrets are not part of the public knowledge or literature and, to Sellers' Knowledge, have not been used, divulged or appropriated either for the benefit of any Person (other than Sellers) or to the detriment of Sellers. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way or infringes any intellectual property right of any other Person.

4.22.8          (i) Part 4.22 contains a complete and accurate list and summary description of all Net Names. (ii) All Net Names have been registered in the name of Sellers and are in compliance with all formal Legal Requirements. (iii) No Net Name has been or is now involved in any dispute, opposition, invalidation or cancellation Proceeding and, to Sellers' Knowledge, no such action is threatened with respect to any Net Name. (iv) To Sellers' Knowledge, there is no domain name application pending of any other person which would or would potentially interfere with or infringe any Net Name. (v) No Net

J .CORELWPDATAIRAWIPeppermil Casinos\As ...t Purchase A .:---ment 3-27-02 w.pd
03/29'': (Thu) 9:19am

Name is infringed or, to Sellers' Knowledge, has been challenged, interfered with or threatened in any way ● Net Name infringes, interferes w● is alleged to interfere with or infringe the trademark, copyright or domain name of any other Person.

4.23   Complimentaries; Clubs; Promotions, Wagers; Deposits. Except as set forth on Part 4.23, none of Sellers is and none will be committed to any slot-club liability, complimentary arrangement, deposit, wager, voucher, travel agent commission for food or beverage, lodging, gaming, or sportsbook wagers for any guest or customer as of the Closing Date or any period thereafter or any similar customer arrangement or benefit. Except as set forth on Part 4.23, Sellers have not issued or committed to issue any discounts, customer entitlement coupons, vouchers, commitments, promotion offers or discounts.

4.24   Disclosure. No representation or warranty or other statement made by any Sellers in this Agreement, the Disclosure Letter, or otherwise in connection with the Transactions contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading. Sellers do not have Knowledge of any fact that has specific application to Sellers (other than general economic or industry conditions) and that may materially adversely affect the Assets, Businesses, prospects, financial condition or results of operations of Sellers that has not been set forth in this Agreement, the Disclosure Letter, or the Exhibits.

4.25   HSR Act.   The total aggregate assets of State Line Hotel, Inc., Jim's Enterprises, Inc., State Line Casino, State Line Properties, Inc., Smith Properties, State Line Properties, Ltd., and State Line Apartments, Ltd. (each a "Related Entity," and collectively, the "Related Entities") as shown on the HSR Balance Sheet (as hereinafter defined) are Ninety-two Million Dollars ($92,000,000). None of the Related Entities is engaged in manufacturing. None of the Related Entities directly or indirectly has any Affiliates (except for another Related Entity) or owns any interest, including company membership interest, in any other Person. The ownership of each of the Related Entities is as set forth on Part 4.25. As used herein, HSR Balance Sheet means the December 31, 2001 consolidated balance sheet of the Related Entities, which Sellers represent and warrant (i) is the last regularly prepared balance sheet for the Related Entities, (ii) is a consolidated balance sheet for all the Related Entities, and (iii) was prepared in accordance with the accounting principles normally used by the Related Entities.

5.   REPRESENTATIONS AND WARRANTIES OF BUYERS. Buyers represent and warrant to Sellers each of the following:

5.1   Due Organization. Wendover Casinos, Inc. is a corporation duly organized, validly existing, and in good standing under the laws of the State of Nevada and Wendover Commercial Properties, Inc. is a corporation duly organized, validly existing, and in good standing under the laws of the State of Utah.

5.2   Due Authorization. The execution, delivery, and performance of this Agreement by the persons executing the same on behalf of Buyers have been duly and validly authorized and this Agreement and the agreements, documents, and instruments

32.

contemplated hereby constitute legal, valid and binding obligations of Buyers, enforceable in accordance with the ⬤ spective terms.

5.3    No Violations.    Neither the execution, delivery or performance of this Agreement will breach any Legal Requirement applicable to Buyers or conflict with or result in a breach of any of the terms, conditions or provisions of any judgment, order, injunction, decree or ruling of any court or governmental authority to which Buyers are subject or any agreements or instruments by which Buyers are bound, or constitute a default thereunder.

6.    COVENANTS OF SELLERS PRIOR TO CLOSING.

6.1    Operation of Businesses.    Between the Effective Date and the Closing Date, Sellers shall:

6.1.1    Conduct the Businesses only in the ordinary course of business as currently conducted;

6.1.2    Except as otherwise directed by Buyers in writing, and without making any commitment on Buyers' behalf, use its commercially reasonable best efforts to preserve intact their current business organizations, keep available the services of their officers, employees and agents and maintain their relations and good will with suppliers, customers, landlords, creditors, employees, agents and others having business relationships with them;

6.1.3    Confer with Buyers prior to implementing operational decisions of a material nature except in the ordinary course of the Businesses;

6.1.4    Otherwise report periodically (but not less frequently than bi-weekly) to Buyers concerning the status of the Businesses, operations and finances;

6.1.5    Maintain the Assets in a state of repair and condition that complies with Legal Requirements and is consistent with the requirements of this Agreement and requirements and normal conduct of the Businesses;

6.1.6    Keep in full force and effect, without amendment, all material rights relating to the Businesses;

6.1.7    Comply with all Legal Requirements and contractual obligations applicable to the operations of the Businesses;

6.1.8    Continue in full force and effect the insurance coverage under the policies set forth in Part 4.18 or substantially equivalent policies;

6.1.9    Cooperate with Buyers and assist Buyers in identifying the Governmental Authorizations required by Buyers to operate the Businesses from and after the Closing Date and either transferring existing Governmental Authorizations of Sellers to Buyers, where permissible, or obtaining new Governmental Authorizations for Buyers;

6.1.10    Upon request from time to time, execute and deliver all documents, make all ⬤ lawful oaths, testify in any Proceed ⬤ and do all other acts that may be reasonably necessary or desirable in the opinion of Buyers to consummate the Transactions, all without further consideration; and

6.1.11    Maintain all books and Records of Sellers relating to the Businesses in the ordinary course of business.

6.2    Negative Covenant.    Except as otherwise expressly permitted herein, between the Effective Date and the Closing Date, Sellers shall not, without the prior written Consent of Buyers, (a) take any affirmative action, or fail to take any reasonable action within its control, as a result of which any of the changes or events listed in Section 4.13 would be likely to occur; or (b) make any modification to any Assigned Contract or Governmental Authorization other than in the ordinary course of the Businesses.

6.3    Required Approvals.    As promptly as practicable after the Effective Date, Sellers shall make all filings required by Legal Requirements to be made by it in order to consummate the Transactions. Sellers also shall cooperate with Buyers with respect to all filings that Buyers elect to make or, pursuant to Legal Requirements, shall be required to make in connection with the Transactions, including, without limitation obtaining licensure approval required from all Nevada Gaming Authorities. Sellers also shall cooperate with Buyers in obtaining all material Consents.

6.4    Notification.    Between the Effective Date and the Closing Date, Sellers shall promptly notify Buyers in writing if any of them becomes aware of (a) any fact or condition that causes or constitutes a Breach of any of Sellers' representations and warranties or (b) the occurrence of any fact or condition that would or be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or Sellers' discovery of, such fact or condition. Should any such fact or condition require any change to the Exhibits or Disclosure Letter, Sellers shall promptly deliver to Buyers a supplement to the Disclosure Letter specifying such change. Such delivery shall not affect any rights of Buyers under Section 10.1 and Article 13. During the same period, Sellers also shall promptly notify Buyers of the occurrence of any Breach of any covenant of Sellers in this Article 6. or of the occurrence of any event that may make the satisfaction of the conditions in Article 8. impossible or unlikely.

6.5    Best Efforts.    Sellers shall use their commercially reasonable best efforts to cause the conditions in Article 8. and Section 9.3 to be satisfied.

6.6    Interim Financial Statements, Gaming Reports, and Other Items.    Until the Closing Date, Sellers shall deliver to Buyers (a) within twenty-five (25) days after the end of each month a copy of Sellers' internal financial statements including balance sheets and related detailed statements of income and equity and accounts receivable and accounts payable schedules all in forms reasonably acceptable to Buyers for such month, and prepared in a manner and containing information consistent with Sellers' current practices and certified by Sellers' chief financial officer as to compliance with Section 4.3., (b) true

and correct copies of all of Sellers' gaming reports filed with the Nevada Gaming Authorities and all correspondence ⬤ rewith, and (c) the other items re⬤ d to in Section 4.3 hereof.

6.7    <u>Change of Name</u>.  On or before the Closing Date, Sellers shall (i) file amendments to their  Governing Documents and take all other actions necessary to change their names to one sufficiently dissimilar to the Business Names, in Buyers' judgment, to avoid confusion and (ii) take all actions requested by Buyers to enable Buyers to change its name to one (1) or more of Sellers' Business Names.

6.8    <u>Assigned Contracts</u>.  Prior to the Closing, Sellers shall obtain a Bankruptcy Court Order which identifies any Breaches which must be cured under any of the Assigned Contracts in order for Sellers to assign them to Buyers.  At Closing Sellers shall cure any such Breaches existing under such Assigned Contracts.

6.9    <u>Employees and Employee Benefits</u>.

6.9.1    <u>Termination</u>.  Not less than sixty (60) days prior to the Closing, and following the expiration of the Due Diligence Period without Buyers' exercise of its cancellation rights, Sellers shall provide written notice of termination to all of its employees, said termination to be effective immediately prior to the Closing.

6.9.2    <u>Employment of Employees by Buyers</u>.  Buyers are not obligated to hire any employee of Sellers but may interview all such employees.  Subject to Legal Requirements, Buyers will have reasonable access to the personnel Records (including performance appraisals, disciplinary actions, grievances and medical Records) of Sellers for the purpose of preparing for and conducting employment interviews with Sellers' employees and will conduct the interviews as expeditiously as possible prior to the Closing Date.  Access will be provided by Sellers upon reasonable prior notice during normal business hours.  As provided in Section 6.9.1 hereof, effective immediately before the Closing, Sellers will terminate the employment of all of its employees.  None of Sellers or Owners nor their Affiliates shall solicit the continued employment of any employee (unless and until Buyers have informed Sellers in writing that the particular employee will not receive any employment offer from Buyers) after the Closing.  It is understood and agreed that (a) Buyers' extension of any offers of employment as set forth in this Section or the payment of any severance amounts as set forth in Section 6.9.8 shall not constitute any commitment, Contract or understanding (expressed or implied) or any obligation on the part of Buyers to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Buyers may establish pursuant to individual offers of employment, and (b) employment offered by Buyers is "at will" and may be terminated by Buyers or by an employee at any time for any reason, unless otherwise set forth in a written Contract signed by both Buyers and an employee or the Legal Requirements. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyers to terminate, reassign, promote or demote any of the employees hired by Buyers after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

'  'C, / P24*A RA-/ Peppermill Casinos\Asset Purchase Agreement 1-27-02 wpd
03/28/2 (Thu) 3:19am

6.9.3 <u>Salaries, Benefits, and Employment Taxes</u>.    Sellers shall be responsible for (a) the payment of all wages and other remuneration due to all of Sellers' employees with respect to their services as employees of Sellers through the close of business on the Closing Date, including, without limitation, prorata bonus payments and all vacation pay earned prior to the Closing Date; (b) all workers' termination rights and employment Taxes; (c) the payment of any termination or severance payments, the provision of health plan continuation coverage and other obligations in accordance with the requirements of COBRA and ERISA Sections 601 through 608; and (d) any and all payments to employees required under the WARN Act.    Sellers shall be liable for any claims made or incurred by any of Sellers' employees and their beneficiaries through the Closing Date under the Plans. For purposes of the immediately preceding sentence, a claim will be deemed incurred, in the case of hospital, medical or dental benefits, when the services that are the subject of the claims are performed and, in the case of other benefits (such as disability or life insurance), when an event has occurred or when a condition has been diagnosed that entitles the employee to the benefit.

6.9.4  <u>Sellers' Retirement and Savings Plans</u>.    All employees who are participants in Sellers' retirement Plans shall retain their accrued benefits under Sellers' retirement Plans as of the Closing Date, and Sellers (or Sellers' retirement Plans) shall retain sole liability for the payment of such benefits as and when such employees become eligible therefor under such Plans.

6.9.5  <u>No Transfer of Plan Assets</u>. None of Sellers nor any of their Affiliates will make any transfer of pension or other employee benefit Plan assets to Buyers.

6.9.6  <u>Collective Bargaining Matters</u>.  Buyers will set its own initial terms and conditions of employment for Sellers' employees (if any) and others it may hire, including work rules, benefits and salary and wage structure, all as permitted by law. Buyers are not obligated to assume any collective bargaining agreements under this Agreement. Notwithstanding the provisions of Section 6.9.8 hereof, Sellers shall be solely liable for any severance payment required to be made to its employees due to the Transactions.

6.9.7  <u>General Employee Provisions</u>.  Sellers and Buyers shall give any notices required by Legal Requirements and take whatever other actions with respect to the Plans, programs and policies described in this Section 6.9. as may be necessary to carry out the arrangements described in this Section 6.9. Notwithstanding the foregoing or any other provision of this Agreement, all WARN Act notices and other Legal Requirements relating to the termination of Sellers' employees shall be the responsibility of Sellers. Sellers and Buyers shall provide each other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Section 6.9. Buyers shall not have any responsibility, liability or obligation, whether to Sellers' employees, former employees, their beneficiaries or to any other Person, with respect to any employee benefit plans, practices, programs or arrangements (including the establishment, operation or termination thereof and the notification and provision of COBRA coverage extension and WARN Act Notices) maintained by Sellers.

J:\COREL\WPDATA\RAW\    d:\as.nos\Asset Purchase Agreement 3-27-02.wpd
03/28/2 (Thu) 9:19am

6.9.8  Certain Severance Payments. At the Closing, Buyers agree to pay to Sellers' employees, B● Frank, the sum of Twenty-five ●usand Dollars ($25,000), Mike Lander, the sum of Twenty-two Thousand, Five Hundred Dollars ($22,500), and Mario Palafax, the sum of Twenty Thousand, Eight Hundred Thirty-three Dollars ($20,833), representing severance pay payable to such employees on Sellers' behalf, provided that (a) all such employees remain employed by Sellers through the Closing Date until terminated by Sellers pursuant to this Section 6.9, and (b) such employees execute and deliver to Buyers at the Closing a release of Buyers and an acknowledgment of the provisions of this Section 6.9 in a form acceptable to Buyers. The foregoing payments shall not affect any of the other provisions of this Agreement, including, without limitation, those of this Section 6.9.  All such payments shall be subject to applicable Tax and other withholding requirements imposed by Governmental Bodies.

6.10    Sale Motion. Sellers shall timely file the Sale Motion with the Bankruptcy Court and exercise best efforts to obtain the Sale Order not later than May 14, 2002. Without limiting the foregoing, the Sale Motion shall provide for (i) the items set forth in Section 2.12 hereof, (ii) Bankruptcy Court findings that any objections to the Transactions based on antitrust (such term being interpreted broadly to include, without limitation, the Sherman Act [15 U.S.C.A. § 1, et seq.], the Clayton Act [15 U.S.C.A. § 18], applicable state antitrust or anti competition statutes, and the case law, regulations, and interpretations thereunder) claims are overruled and that any future objections to the Transactions based on antitrust claims are barred, and (iii) such other items as are reasonably acceptable to Buyers. Sellers agree to provide copies of the Sale Motion and notice of the hearing thereon to the Red Garter Hotel Casino, all other Persons designated by Buyers, and all other Persons required under any Legal Requirement.

6.11    Wendover Boulevard Walkway Airspace Lease. Sellers agree to exercise their best efforts to obtain an extension of the existing lease or a new lease with the City of West Wendover, Nevada for the existing walkway over Wendover Boulevard connecting the State Line and Silver Smith Hotel Casinos in a form reasonably acceptable to Buyers not later than June 30, 2002. Such lease shall constitute an Assigned Contract.

7.    COVENANTS OF BUYERS PRIOR TO CLOSING.

7.1    Required Approvals.

7.1.1  Nevada Gaming Authorities Approvals. As promptly as possible after the Effective Date, Buyers shall file with the Nevada Gaming Authorities for a non-restricted Nevada gaming license for the conduct of gaming Businesses on the Real Property. Buyers agree to diligently and in good faith file and process such application and to exert its best efforts to avoid delays in the processing of the application.  Sellers agree to cooperate with and assist Buyers and the Nevada Gaming Authorities to obtain prompt approval of the application.

7.1.2  Other Requirements. As promptly as practicable after the Effective Date, Buyers shall make, or cause to be made, all filings required by all other Legal ≈equirements to be made by it to consummate the Transactions. Buyers also shall

cooperate with Sellers (a) with respect to all filings Sellers shall be required by Legal Requirements to make and (b) in obtaining all Consents required in order for the Closing to occur; provided, however, that Buyers shall not be required to dispose of or make any change to its business, or incur any other material burden in order to comply with this Section 7.1.

7.2    Best Efforts.  Buyers shall use its commercially reasonable best efforts to cause the conditions in Article 9. to be satisfied.

8.    CONDITIONS PRECEDENT TO BUYERS' OBLIGATION TO CLOSE.  Buyers' obligation to purchase the Assets and to take the other actions required to be taken by Buyers at the Closing is subject to the satisfaction, at or prior to the Closing or such other dates as are provided elsewhere in this Agreement, as applicable, of each of the following conditions (any of which may be waived by Buyers, in whole or in part):

8.1    Due Diligence Investigation.  Buyers' approval of the suitability of the Assets on or before the expiration of the Due Diligence Period in accordance with the provisions of Article 3. hereof.

8.2    Title Exceptions; Title Insurance.  Buyers' approval of the exceptions to title to the Assets in accordance with the provisions of Section 2.6 hereof.  Buyers shall have received the unconditional and binding commitment to issue the Title Insurance Policy consistent with Section 2.6, dated the Closing Date, in an aggregate amount equal to the amount of the Purchase Price allocated to the Real Property, deleting all requirements listed in ALTA Schedule B-1, amending the effective date to the date and time of recordation of the Deeds with no exception for the gap between Closing and recordation, deleting or insuring over Title Objections as required pursuant to Section 2.6, attaching all indorsements required by Buyers in order to ensure provision of all coverage required pursuant to Section 2.6 and otherwise in form satisfactory to Buyers insuring Buyers' interest in each parcel of Real Property or interest therein to the extent required by Section 2.6.

8.3    Accuracy of Representations.  All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if then made, without giving effect to any supplement to the Disclosure Letter.

8.4    Sellers' Performance.  All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects, including, without limitation, causing the recordation of the Restrictive Covenant.

8.5    Consents.  Each of the Consents required in order for the Closing to occur shall have been obtained and shall be in full force and effect.

38.    46

8.6   Additional Documents. Sellers shall have caused the Assignments, Bills of Sale, Deeds, Assignment and Assumption Agreement, the Post-Closing Escrow Agreement, the Owners Covenant Agreement, and other documents and instruments required by Section 11.3.1 and the following documents to be executed, delivered (or tendered subject only to Closing) to Buyers:

8.6.1   If requested by Buyers, any Consents or other instruments that may be required to permit Buyers' qualification in each jurisdiction in which Sellers are licensed or qualified to do business as a foreign corporation under the name "Silver Smith" or "State Line" or any derivative thereof;

8.6.2   Certificates dated as of a date not earlier than the third business day prior to the Closing as to the good standing of Sellers;

8.6.3   An assignment of the Wendover Boulevard walkway lease as provided in Section 6.11 hereof; and

8.6.4   Such other documents as Buyers may reasonably request for the purpose of: (i) evidencing the accuracy of any of Sellers' representations and warranties; (ii) evidencing the performance by Sellers of, or the compliance by Sellers or Owners with, any covenant or obligation required to be performed or complied with by Sellers; (iii) evidencing the satisfaction of any condition referred to in this Article 8.; or (iv) otherwise facilitating the consummation or performance of any of the Transactions.

8.7   No Proceedings.   Since the Effective Date there shall not have been commenced or threatened against Buyers or any other Person  any Proceeding (a) involving any challenge to, or seeking Damages or other relief in connection with, any of the Transactions, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the Transactions.

8.8   No Conflict. Neither the consummation nor the performance of any of the Transactions will, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Buyers or any Affiliate of Buyers to suffer any adverse consequence under (a) any applicable Legal Requirement or Order or (b) any Legal Requirement or Order that has been published, introduced or otherwise proposed by or before any Governmental Body.

8.9   Governmental Authorizations. Buyers shall have received (a) the approval of the Transactions by the Nevada Gaming Authorities and a nonrestricted gaming license for the conduct of the gaming Businesses on the Real Property, (b) all necessary business and liquor licenses for the conduct of the Businesses on the Real Property as is being conducted by Sellers from the Effective Date from the City of West Wendover, County of Elko, States of Nevada and Utah, and any other applicable Governmental Authorities, (c) certificates of occupancy for the Real Property which authorize Buyers to continue the uses of the Real Property after the Closing Date for the same Businesses as conducted by Sellers prior to the Effective Date, and (d) such other Governmental Authorizations as are

necessary or desirable to allow Buyers to operate the Businesses and own the Assets from and after the Closing ●.

8.10    Approvals.  The Transaction shall have been approved by all applicable Governmental Bodies.

8.11    WARN Act Notice Period and Employees.  All requisite notice periods under the WARN Act and all other Legal Requirements regarding the termination of Sellers' employees shall have expired.

8.12    Closing Under Ancillary Real Property Sale Agreements.  The closings under the Ancillary Real Property Sale Agreements shall have occurred (concurrently with the Closing).

8.13    Chapter 11 Case.

8.13.1    The substance of the Sale Motion, other Motions, the Sale Order and all other Bankruptcy Court orders entered in response to all filings shall be acceptable to Buyers.

8.13.2    The Sale Order shall be entered by the Bankruptcy Court in a form consistent with the Sale Motion and as otherwise required under this Agreement and recorded.

9.    CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE.  Sellers' obligation to sell the Assets and to take the other actions required to be taken by Sellers at the Closing is subject to the satisfaction, at or prior to the Closing (as applicable), of each of the following conditions (any of which may be waived by Sellers in whole or in part):

9.1    Accuracy of Representations.  All of Buyers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing as if then made.

9.2    Buyers' Performance.  All of the covenants and obligations that Buyers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been performed and complied with in all material respects.

9.3    Consents.  Each of the Consents required in order for the Closing to occur shall have been obtained and shall be in full force and effect.

9.4    Additional Documents.  Buyers shall have caused the documents and instruments required by Section 11.3.2 and the following documents to be delivered (or tendered subject only to Closing) to Sellers:

9.4.1  Such other documents as Sellers may reasonably request for the purpose of (i) evidenc[]he accuracy of any representat[]or warranty of Buyers, (ii) evidencing the performance by Buyers of, or the compliance by Buyers with, any covenant or obligation required to be performed or complied with by Buyers or (iii) evidencing the satisfaction of any condition referred to in this Article 9.

9.5    No Proceedings.   Since the Effective Date there shall not have been commenced or threatened against Sellers any Proceeding (a) involving any challenge to, or seeking Damages or other relief in connection with, any of the Transactions, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the Transactions.

9.6    Approvals.   The Transaction shall have been approved by all applicable Governmental Bodies.

9.7    Consulting and Noncompete Agreements.   Buyers shall have executed and delivered the Consulting and Noncompete Agreements.

9.8    WARN Act Notice Period and Employees.   All requisite notice periods under the WARN Act and all other Legal Requirements regarding the termination of Sellers' employees shall have expired.

9.9    Closing Under Ancillary Real Property Sale Agreements.   The closing under the Ancillary Real Property Sale Agreements shall have occurred (concurrently with the Closing).

10.    TERMINATION.

10.1    Termination Events.   By notice given prior to or at the Closing as provided below or elsewhere in this Agreement, as applicable, subject to Section 10.3, this Agreement may be terminated as follows:

10.1.1    By Buyers if a material Breach of any provision of this Agreement has been committed by Sellers and such Breach has not been waived by Buyers;

10.1.2    By Sellers if a material Breach of any provision of this Agreement has been committed by Buyers and such breach has not been waived by Sellers;

10.1.3    By Buyers if any condition in Article 8. has not been satisfied as of the Closing Date specified in Section 11.2 or such earlier date specified in Article 8. of elsewhere in this Agreement or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Buyers to comply with its obligations under this Agreement), and Buyers have not waived such condition on or before such date;

CORELIWPDATA'RAV.    ...null Casir a Asset Purchase Agreement 3-27-02 wpd
03/28/2 (Thu) 9:19am