ORIGINAL

RECEIVED
AND FILED

2004 JAN 16  PM 2: 22

UNITED STATES
BANKRUPTCY COURT
PATRICIA GRAY, CLERK

RON BENDER (California SBN 143364)
NELLWYN VOORHIES (California SBN 168698)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

SALLIE B. ARMSTRONG (Nevada SBN 001243)
DOWNEY BRAND, LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile: (775) 786-5443

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF

RENO, NEVADA

| | |
|---|---|
| In re | Case No. BK-N-02-50085 GWZ |
| | Chapter 11 Jointly |
| STATE LINE HOTEL, INC., a Nevada | Administered With |
| corporation, | BK-N-02-50081 GWZ |
| Debtor. | BK-N-02-50083 GWZ |
| ☐ Affects this Debtor. _____/ | BK-N-02-50082 GWZ |
| ☒ Affects all Debtors. _____/ | BK-N-02-50086 GWZ |
| ☐ Affects STATE LINE CASINO, a | BK-N-02-50084 GWZ |
| Nevada general partnership,/ | BK-N-02-50080 GWZ |
| ☐ Affects STATE LINE PROPERTIES, | |
| INC., a Utah Corp. _____/ | CHAPTER 11 |
| ☐ Affects STATE LINE PROPERTIES, | |
| LTD., a Utah limited partnership,/ | COMPLAINT TO ENFORCE |
| ☐ Affects STATE LINE APARTMENTS, | COMPLIANCE WITH COURT |
| LTD., a Utah general partnership, _____/ | ORDER AND SEEKING PAYMENT |
| ☐ Affects JIM'S ENTERPRISES, INC., a | OF AMOUNTS OWED PURSUANT |
| Nevada Corp. _____/ | TO SALE OF ASSETS |
| ☐ Affects SMITH PROPERTIES, a Nevada | |
| general partnership/ | |

1

1

2

3    STATE LINE HOTEL, INC., a Nevada
     corporation; STATE LINE CASINO, a
4    Nevada general partnership; STATE LINE
     PROPERTIES, INC., a Utah Corp.; STATE
5    LINE PROPERTIES, LTD., a Utah limited
     partnership; STATE LINE APARTMENTS,
6    LTD., a Utah general partnership; JIM'S
     ENTERPRISES, INC., a Nevada Corp.;
7    SMITH PROPERTIES, a Nevada general
     partnership,
8

9                    Plaintiffs,

10

11   vs.

12   GENERATION 2000, LLC, a Nevada
     limited liability company
13

14                   Defendant.

15

16        Smith Properties, a Nevada general partnership, Jim's Enterprises, Inc., a Nevada

17   corporation, State Line Hotel, Inc., a Nevada corporation, State Line Properties, Inc., a Utah

18   corporation, State Line Casino, a Nevada general partnership, State Line Properties, Ltd., a Utah

19   limited partnership, and State Line Apartments, a Utah general partnership (each a "Debtor" and

20   collectively, the "Debtors"), Chapter 11 Debtors and Debtors in Possession, hereby file this

21   complaint seeking payment of the amounts owed to the Debtors pursuant to the sale (the "Sale")

22   of a portion of the Debtors' assets to Generation 2000, LLC, a Nevada limited liability company

23   ("Gen 2000"). In support of this complaint the Debtors allege as follows:

24   ///

25   ///

26

27

28
                                            2

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334.

2.    This adversary proceeding arises in and relates to the Plaintiffs' bankruptcy cases, which were filed in the District of Reno, Nevada ("Bankruptcy Court") on January 10, 2002 (the "Petition Date") under Chapter 11.

3.    This adversary proceeding is brought to enforce the order of the Court entered on November 18, 2002 (the "Sale Order"), a true and correct copy of which is attached hereto as Exhibit "A."

4.    Venue in the Court is proper pursuant to 28 U.S.C. Section 1409.

5.    This is a "core" proceeding as defined by 28 U.S.C. Sections 157(b)(2)(A),(F) and (N).

## PARTIES

6.    Smith Properties, a Nevada general partnership, Jim's Enterprises, Inc., a Nevada corporation, State Line Hotel, Inc., a Nevada corporation, State Line Properties, Inc., a Utah corporation, State Line Casino, a Nevada general partnership, State Line Properties, Ltd., a Utah limited partnership, and State Line Apartments, a Utah general partnership, Chapter 11 Debtors and Debtors in Possession herein (each a "Debtor" and collectively, the "Debtors"), commenced the above captioned bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on January 10, 2002. The Debtors continue to operate their businesses and manage their financial affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

7.    The Debtors are informed and believe and thereon allege that Gen 2000 is a limited liability company.

8.    Gen 2000 agreed to subject itself to the jurisdiction of this Court in any proceeding related to the Sale Order.

A.    Background

9.    The Debtors commenced these bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on January 10, 2002.

10.    At the time of the filing of their Voluntary Petitions the Debtors' financial condition and resources were in dire straits.  The Debtors were faced with the possibility of a business failure as they were not able to meet their financial obligations.

11.    The Debtors operated two hotels and casinos primarily in West Wendover, Nevada under the trade names of State Line Hotel and Casino and Silver Smith Hotel and Casino (collectively, the "Hotel/Casinos").

B.    The Sale of Assets

12.    After extensive negotiations, which commenced months prior to the Debtors' bankruptcy filings, the Debtors reached an agreement with Wendover Casinos, Inc., Wendover Commercial Properties, Inc., and Peppermill Properties, LLC (collectively, "Peppermill") to sell the majority of the Debtor's assets (the "Assets") to Peppermill for the total sum of $49.6 million, subject to various adjustments (the "Original Sale Agreement").

13.    The Court approved the Original Sale Agreement at a hearing held on May 21, 2002.

4

14. In September 2002, Peppermill advised the Debtors that it was terminating the Original Sale Agreement because Peppermill contended that the Debtors had breached the Original Sale Agreement and that the then pending investigation being conducted by the Federal Trade Commission ("FTC") would make consummating the Original Sale Agreement too costly and time-consuming.

15. The Debtors denied that they had breached the Original Sale Agreement.

16. After Peppermill terminated the Original Sale Agreement, the Lenders terminated their consent to the Debtors' continued use of the Lenders' cash collateral.

17. A hearing was subsequently held on September 6, 2002 for the Court to consider the Debtors' emergency motion for authority to continue using cash collateral.

18. At the September 6, 2002 hearing, the Court ordered that the Debtors had until September 13, 2002 to file a motion for authority to sell the Assets to a different buyer, and that a hearing would be held on October 7, 2002 for the Court to consider any such motion filed by the Debtors.

19. On September 13, 2002, the Debtors filed a Sale Motion with the Court in which the Debtors sought Court authority to sell the Assets to an entity known as SLP Properties, Inc., an entity related to Isle of Capri Casinos, Inc. ("Capri"), for the cash sum of $30 million, subject to certain adjustments, or to any successful overbidder.

20. A number of prospective overbidders appeared at the October 7, 2002 hearing and stated an intention to overbid the $30 million offer submitted by Capri.

21. The Debtors made clear on the record of the Court that any such overbid had to include the same terms of sale agreed to by Capri.

22.    One such overbidder consisted of Peppermill and Gen 2000, which collectively advised the Court that they intended to submit a joint bid for the Assets. Peppermill and 2000 shall be jointly referred to herein as "Peppermill/2000".

23.    At the conclusion of the bidding, the Court determined that the $55 million cash bid with a $22 million cash non-refundable deposit submitted by Peppermill/2000 was the highest and best bid for the Assets, and the Court approved the Debtors' sale of the Assets to Peppermill/2000.

24.    The terms of the Sale were set forth in detail in the Sale Order and in the operative agreements which were be entered into between the Debtors and Peppermill/2000 and filed with the Court.

25.    In addition to the fifty-five million dollar ($55,000,000.00) all cash purchase price that Peppermill/2000 agreed to pay to the Debtors, Peppermill/2000 agreed to pay cash to the Debtors at the closing equal to the amount of the Debtors' Bankroll existing at the closing, and Peppermill/2000 agreed to purchase all of the Debtors' remaining food and beverage inventory which is unopened and not outdated or unusable.

26.    Peppermill/2000 also agreed that they would fund all of the Debtors' operating losses related to the Assets, based on ordinary and necessary business expenses (calculated on a cumulative EBITDA basis) incurred by the Debtors from October 7, 2002 through the closing; provided the Debtors did not incur any expense outside the ordinary course of business without Peppermill/2000's prior written consent; there was a continuity of existing management unless Peppermill/2000 desire otherwise; and Peppermill/2000 was afforded the ability to monitor

existing management to the full extent permitted by the Nevada gaming authorities and the antitrust laws prior to the closing if Peppermill/2000 desire.

27.     The Sale Order further provided that "EBITDA" means operating income/losses before interest, taxes, depreciation and amortization, computed in accordance with gaming and rental property industry standards on an accrual basis consistent with generally accepted accounting principles. The write-off of bad debts during the period of October 7, 2002 through the closing shall not be considered an expense for the purpose of determining operating losses. Any payment on account of operating losses by Peppermill/2000 shall be made at the time of closing, unless otherwise ordered by the Court. Any disputes with regard to management, operating issues or computation of operating losses shall be resolved by the Court and may be brought before the Court on shortened time.

28.     The Sale closed on December 19, 2002.

29.     On December 15, 2003, the Debtors sent a demand to Gen 2000 for payment of the losses incurred by the assets sold to Gen 2000 for the period of October 7, 2002 through December 19, 2002 (the "Demand Letter"). The letter demanded payment of $467,621 by January 5, 2004. A copy of the letter is attached hereto as Exhibit "B."

30.     The Debtors have not received any response to the Demand Letter sent to Gen 2000.

**PRAYER**

WHEREFORE, the Debtors pray as follows:

1.      That this Court order Gen 2000 to comply with the Sale Order and pay the Debtors $467,621.00.

7

2.    That the Debtors be awarded attorneys' fees and costs; and

3.    That the Debtors be awarded such other relief as the Court deems appropriate under the circumstances of this case.

Dated: January 15, 2004                LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.


                                       _____
                                       Ron Bender
                                       Nellwyn W. Voorhies
                                       Attorneys for Debtors
                                       and Debtors-in-Possession

8

# EXHIBIT

# A

ORIGINAL    FILED AND ENTERED 5 NOV REC'D

RON BENDER (California SBN 143364)
NELLWYN VOORHIES (California SBN 168698)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P. '02 NOV 8 A 8:52
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

SALLIE B. ARMSTRONG (Nevada SBN 001243)
ARMSTRONG MILLER, LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile: (775) 786-5443

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF

RENO, NEVADA

| | |
|---|---|
| In re<br><br>STATE LINE HOTEL, INC., a Nevada corporation,<br><br>Debtor.<br><br>☐ Affects this Debtor. _____/<br>☒ Affects all Debtors. _____/<br>☐ Affects STATE LINE CASINO, a Nevada general partnership,/<br>☐ Affects STATE LINE PROPERTIES, INC., a Utah Corp. _____/<br>☐ Affects STATE LINE PROPERTIES, LTD., a Utah limited partnership, /<br>☐ Affects STATE LINE APARTMENTS, LTD., a Utah general partnership, /<br>☐ Affects JIM'S ENTERPRISES, INC., a Nevada Corp. _____/<br>☐ Affects SMITH PROPERTIES, a Nevada general partnership/ | Case No. BK-N-02-50085 GWZ<br>Chapter 11 Jointly<br>Administrated With<br><br>BK-N-02-50081 GWZ<br>BK-N-02-50083 GWZ<br>BK-N-02-50082 GWZ<br>BK-N-02-50086 GWZ<br>BK-N-02-50084 GWZ<br>BK-N-02-50080 GWZ<br><br>CHAPTER 11<br><br>ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES<br><br>Date:    October 7, 2002<br>Time:    12:00 p.m. |

A hearing was held on October 7, 2002 (the "Sale Hearing"),

before the Honorable Gregg W. Zive, United States Bankruptcy

Judge, at the Clifton Young Federal Building, 300 Booth Street,

EXHIBIT A

Bankruptcy Courtroom, First Floor, Reno, Nevada for the Court to consider the motion (the "Sale Motion") filed by SMITH PROPERTIES, a Nevada general partnership ("SPGP"), JIM'S ENTERPRISES, INC., a Nevada corporation ("JEI"), STATE LINE HOTEL, INC., a Nevada corporation ("SLHI"), STATE LINE PROPERTIES, INC., a Utah corporation ("SLPI"), STATE LINE CASINO, a Nevada general partnership ("SLCGP"), STATE LINE PROPERTIES, LTD., a Utah limited partnership ("SLPLTD"), and STATE LINE APARTMENTS, a Utah general partnership ("SLAGP") (collectively, the "Debtors"), Chapter 11 Debtors and Debtors in Possession, for an order of the Bankruptcy Court approving the sale (the "Sale") of a substantial portion of the Debtors' assets (the "Assets") to the highest bidder.

Ron Bender and Nellwyn Voorhies of Levene, Neale, Bender, Rankin & Brill L.L.P. and Sallie Armstrong of Armstrong Miller LLP appeared on behalf of the Debtors. Kaaran Thomas and Bob L. Olson of Beckley Singleton, Chtd. appeared on behalf of the Official Committee of Unsecured Creditors (the "Committee"). Catherine D. Meyer and Mark D. Houle of Pillsbury Winthrop LLP appeared on behalf of Zions First National Bank, in its capacity as Agent for a group of lenders consisting of Zions First National Bank, Wells Fargo Bank, N.A., Comerica Bank and Foothill Capital Corporation (collectively, the "Lenders"). Gary Woodbury appeared on behalf of Elko County. Stephen R. Harris appeared on behalf of the City of West Wendover. Other appearances were made as noted on the record of the Court.

The Debtors filed the Sale Motion on September 13, 2002, accompanied by the Declarations of Michael Devine and Scott Dunfrund. The Lenders filed an opposition to the Sale Motion. The Committee filed a response and limited objection to the Sale Motion. The Debtors filed a response to the Lenders' opposition to the Sale Motion. The Debtors then filed a supplement to the Sale Motion.

The Court, having read and considered all of the foregoing pleadings, as well as all other pleadings filed with the Court by the parties, and the Court, having considered the statements, arguments and representations of counsel at the hearing and having conducted an open auction of the Assets, and good cause appearing,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    The Court has jurisdiction to hear and determine these matters pursuant to 28 U.S.C. §§ 1334 and 157. Venue of this proceeding in this district is proper pursuant to 28 U.S.C. § 1409. These matters constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). The statutory predicates for the relief granted herein are sections 105, 363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

B.    The Debtors commenced these bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on January 10, 2002. At the time of their bankruptcy filings, the Debtors' financial condition and resources were in dire straits.

The Debtors were faced with the possibility of a business failure as they were not able to meet their financial obligations. The Debtors continue to operate their businesses and manage their financial affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

C.    SLHI and SLCGP operate a hotel and casino primarily in West Wendover, Nevada under the trade name of State Line Hotel and Casino (the "State Line Hotel and Casino"). JEI operates a hotel and casino primarily in West Wendover, Nevada under the trade name of Silver Smith Hotel and Casino (the "Silver Smith Hotel and Casino").

D.    SPGP and SLHI are the owners of various parcels of real property in the State of Nevada, which are not utilized in the operation of the State Line Hotel and Casino or the Silver Smith Hotel and Casino. SLPI, SLPLTD and SLAGP are the owners of various parcels of real property in the State of Utah, which are not utilized in the operation of the State Line Hotel and Casino or the Silver Smith Hotel and Casino.

E.    All seven of the Debtors are liable to the Lenders, and all seven of the Debtors share common ownership.

F.    The Lenders contend that the Debtors are indebted to the Lenders in amounts in excess of $47 million.

G.    The Debtors have no ability to successfully reorganize absent a major cash infusion, and no such cash infusion has been offered to the Debtors.

H.   After extensive negotiations, which commenced months prior to the Debtors' bankruptcy filings, the Debtors reached an agreement with Wendover Casinos, Inc., Wendover Commercial Properties, Inc., and Peppermill Properties, LLC (collectively, "Peppermill") to sell the Assets to Peppermill for the total sum of $49.6 million, subject to various adjustments (the "Original Sale Agreement").

I.   The Court approved the Original Sale Agreement at a hearing held on May 21, 2002.

J.   In September, 2002, Peppermill advised the Debtors that it was terminating the Original Sale Agreement because Peppermill contended that the Debtors had breached the Original Sale Agreement and that the then pending investigation being conducted by the Federal Trade Commission ("FTC") would make consummating the Original Sale Agreement too costly and time-consuming. The Debtors denied that they had breached the Original Sale Agreement.   Peppermill subsequently asserted a $500,000 administrative claim against the Debtors which Peppermill contended it was entitled to pursuant to the terms of the Original Sale Agreement.

K.   After Peppermill terminated the Original Sale Agreement, the Lenders terminated their consent to the Debtors' continued use of the Lenders' cash collateral.   A hearing was subsequently held on September 6, 2002 for the Court to consider the Debtors' emergency motion for authority to continue using cash collateral.

L. At the September 6, 2002 hearing, the Court ordered that the Debtors had until September 13, 2002 to file a motion for authority to sell the Assets to a different buyer, and that a hearing would be held on October 7, 2002 for the Court to consider any such motion filed by the Debtors.

M. On September 13, 2002, the Debtors filed the Sale Motion with the Court in which the Debtors sought Court authority to sell the Assets to an entity known as SLP Properties, Inc., an entity related to Isle of Capri Casinos, Inc. ("Capri"), for the cash sum of $30 million, subject to certain adjustments, or to any successful overbidder. The Lenders filed an opposition to the Sale Motion, and the Committee filed a response and limited objection to the Sale Motion.

N. On October 4, 2002, the Debtors filed a supplement to the Sale Motion (the "Supplement") in which the Debtors contended that Capri had agreed to certain modifications to the Debtors' sale agreements with Capri which were favorable to the Debtors' estates. Capri advised the Court at the October 7, 2002 hearing that Capri had agreed to the modifications set forth in the Supplement. Pursuant to the Supplement, Capri had agreed to the following modifications:

i. Capri agreed to a closing date of the earlier of (i) November 30, 2002 and (ii) the date which was five days following approval by the Nevada Gaming Commission, with the outside closing date to be extended beyond November 30, 2002 only if necessary to obtain approval of the Nevada Gaming Commission.

ii. Capri agreed that there were no remaining conditions to closing other than approval of the Nevada Gaming Commission and Bankruptcy Court approvals and orders.

iii. Capri agreed that it would fund all operating losses incurred by the Debtors from October 7, 2002 through the closing, but not later than December 31, 2002, (provided the Debtors did not incur any expense outside the ordinary course of business without Capri's prior written consent; there was a continuity of existing management unless Capri desired otherwise; Capri was afforded the ability to assist existing management with management acceptable to Capri prior to the closing if Capri desired; and other Bankruptcy Court approvals and protections as Capri reasonably deemed necessary).

iv. Capri agreed that there would be no deductions to the purchase price (e.g., for expenses such as the progressive slot liability, the chip and token liability and outstanding wagers).

v. Capri agreed that there would be no deductions to the purchase for cure amounts owing with respect to executory contracts and unexpired leases assumed by the Debtors and assigned to Capri, and that Capri would fund all cure amounts existing with respect to executory contracts and unexpired leases that Capri desired for the Debtors to assume and assign to Capri.

O. A number of prospective overbidders appeared at the October 7, 2002 hearing and stated an intention to overbid the $30 million offer submitted by Capri. The Debtors made clear on

the record of the Court that any such overbid had to include the same modifications that Capri agreed to as set forth in paragraph N above.

P.   One such overbidder was an entity known as CP Wendover, LLC ("CP"). Another such overbidder consisted of Peppermill and an entity known as Generation 2000, LLC ("2000"), which collectively advised the Court that they intended to submit a joint bid for the Assets. Peppermill and 2000 shall be jointly referred to herein as "Peppermill/2000".

Q.   At the conclusion of the bidding, the Court determined that the $55 million cash bid with a $22 million cash non-refundable deposit submitted by Peppermill/2000 was the highest and best bid for the Assets, and the Court approved the Debtors' sale of the Assets to Peppermill/2000. The Court also approved a $46 million cash backup bid from CP.

R.   The terms of the Sale are set forth in detail in this Order and in the operative agreements which will be entered into between the Debtors and Peppermill/2000 and filed with the Court upon completion.  The operative agreements shall include an "Asset Purchase Agreement" between the Debtors and Peppermill, a "Real Property Purchase Agreement" between the Debtors and Peppermill, an "Asset Purchase Agreement" between the Debtors and 2000, and a "Real Property Purchase Agreement" between the Debtors and 2000. The operative agreements, together with their attachments and exhibits, shall be collectively referred to herein as the "Agreements".

S.    The Agreements shall provide for the fifty-five million dollar  ($55,000,000.00)  purchase  price  to  be  paid  by Peppermill/2000 for their purchase of the Assets to be allocated as set forth below.

Peppermill shall pay the purchase price of Twenty-Three Million Dollars ($23,000,000) for the following:

1) Silver Smith Hotel and Casino
2) 3.5 Acres
3) 10 Acres
4) 13.43 Acres
5) Entertainer Units; Apartments, Ltd.; Dorm A
6) Human Resources Building
7) 10.233 Acres (Pueblo)
8) Bonneville Apartments

Generation 2000 shall pay the purchase price of Thirty-Two Million Dollars ($32,000,000) for the following:

1) State Line Hotel and Casino
2) RV Park
3) 27.847 Acres
4) Needlepoint Trailer Park

T.    In  addition  to  the  fifty-five  million  dollar ($55,000,000.00) all cash purchase price that Peppermill/2000 will be paying to the Debtors, Peppermill/2000 will be paying cash to the Debtors at the closing equal to the amount of the Debtors' Bankroll existing at the closing, and Peppermill/2000 will be purchasing all of the Debtors' remaining food and beverage inventory which is unopened and not outdated or unusable.

U.    Peppermill/2000 agreed to a closing date of the earlier of (i) November 30, 2002 and (ii) the date which is five days

following approval of the Nevada Gaming Commission, with the outside closing date to be extended beyond November 30, 2002 only if necessary to obtain approval of the Nevada Gaming Commission. Peppermill/2000 have agreed that under no circumstance may the closing date be extended beyond December 31, 2002 absent a further order of the Court.

V. The Debtors and Peppermill/2000 agreed that there are no remaining conditions to closing other than approval of the Nevada Gaming Commission and Bankruptcy Court approvals and orders.

W. Peppermill/2000 agreed that they would fund all of the Debtors' operating losses related to the Assets, based on ordinary and necessary business expenses (calculated on a cumulative EBITDA basis) incurred by the Debtors from October 7, 2002 through the closing; provided the Debtors do not incur any expense outside the ordinary course of business without Peppermill/2000's prior written consent; there is a continuity of existing management unless Peppermill/2000 desire otherwise; and Peppermill/2000 is afforded the ability to monitor existing management to the full extent permitted by the Nevada gaming authorities and the antitrust laws prior to the closing if Peppermill/2000 desire. As used herein, EBITDA means operating income/losses before interest, taxes, depreciation and amortization, computed in accordance with gaming and rental property industry standards on an accrual basis consistent with generally accepted accounting principles. The write-off of bad

debts during the period of October 7, 2002 through the closing shall not be considered an expense for the purpose of determining operating losses. Any payment on account of operating losses by Peppermill/2000 shall be made at the time of closing, unless otherwise ordered by the Court. Any disputes with regard to management, operating issues or computation of operating losses shall be resolved by the Court and may be brought before the Court on shortened time.

X. Peppermill/2000 agreed that there would be no deductions to the purchase price (e.g., for expenses such as the progressive slot liability, the chip and token liability and outstanding wagers).

Y. Peppermill/2000 agreed that there would be no deductions to the purchase for cure amounts, owing with respect to executory contracts and unexpired leases assumed by the Debtors and assigned to Peppermill or 2000 (as the case may be) and that Peppermill or 2000 (as the case may be) would fund all cure amounts existing with respect to executory contracts and unexpired leases that Peppermill or 2000 (as the case may be) desired for the Debtors to assume and assign to Peppermill or 2000 (as the case may be). Peppermill/2000 shall not be obligated to assume or cure any executory contracts or unexpired leases except those expressly designated by Peppermill or 2000 (as the case may be).

Z.    Peppermill and 2000 elected not to enter into any consulting or non-compete agreements with any insiders of the Debtors.

AA.    The Debtors have demonstrated that their proposed sale of the Assets to Peppermill/2000 is based on sound business justifications, is in the best interest of the Debtors' estates, and will yield the highest and best possible return to creditors. If the sale of the Assets is delayed pending the confirmation of a plan of reorganization, the value of the Assets would decline, and less money would be realized for creditors.

BB.    Notice of the Sale Motion and the Sale Hearing was proper and appropriate under the circumstances of these cases.

CC.    The Debtors' proposed sale of the Assets to Peppermill/2000 has been proposed in good faith in accordance with section 363(m) of the Bankruptcy Code.  Peppermill/2000 are therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

DD.  Peppermill/2000 did not engage in any conduct that would allow the Debtors' sale of the Assets to Peppermill/2000 to be set aside pursuant to Section 363(n) of the Bankruptcy Code or for any other reason.

EE.    There is no basis to stay the consummation of the Debtors' sale of the Assets to Peppermill/2000 pending any appeal of this Order.

FF.    The consideration to be received by the Debtors from Peppermill/2000 represents the fair market value of the Assets,

is fair and reasonable and represents the best offer received by the Debtors.

GG. Peppermill/2000 have agreed that they are required to deliver a deposit in the amount of $22 million to the Debtors by the close of business on Wednesday, October 9, 2002. Peppermill/2000 have further agreed that the $22 million deposit shall under all circumstances be completely non-refundable.

Based upon all of the foregoing and good cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Debtors' sale of the Assets to Peppermill/2000 for the total cash sum of fifty-five million dollars ($55,000,000.00) is approved in accordance with the terms of this Order and the Agreements to be entered into between the parties.

2. Any dispute regarding the Agreements shall be resolved by the Court and may be brought before the Court on shortened time.

3. The parties shall use their best efforts to attempt to reach an agreement on an allocation of values between real and personal property and between the various Debtors. Any such agreement shall be subject to the approval of the Court. In the absence of such an agreement, the Court will determine the appropriate allocation of values between real and personal property and between the various Debtors. The Debtors shall not agree to any allocation prior to consultation with and input from the Committee and the Lenders. The Debtors shall keep the

Committee and the Lenders apprised of all discussions and other communications that the Debtors have with Peppermill/2000 with respect to allocation issues.

4.    All objections to the Sale are overruled.

5.    The Debtors are authorized and instructed to take such steps as may be necessary to consummate the Sale on the terms set forth in this Order and the Agreements to be entered into between the parties and to fully and completely cooperate with Peppermill/2000 in an effort to consummate the Sale.

6.    Peppermill/2000 shall be required to deliver a deposit in the amount of twenty-two million dollars ($22,000,000.00) (the "Deposit") to the Debtors by the close of business on Wednesday, October 9, 2002.   The Deposit shall be non-refundable.   The Debtors shall maintain the Deposit in an interest bearing segregated trust account.   All interest accrued on the Deposit shall inure to the benefit of the Debtors' estates.

7.    The Debtors shall hold all of the proceeds from the Sale in a segregated interest bearing account pending a further order of the Court.   None of the proceeds of the Sale shall be disbursed absent a prior order of the Court authorizing such disbursement.

8.    The Debtors are authorized and instructed to take all reasonable and necessary steps, to execute all necessary documents, and to cooperate fully with Peppermill/2000 to consummate the Sale of the Assets to Peppermill/2000 and to properly transfer title to the Assets to Peppermill/2000 in

accordance with the terms of this Order and the Agreements to be entered into between the parties, including, but not limited to, using their reasonable best efforts to timely provide all required or requested information and documents to the Nevada gaming authorities, the antitrust authorities, and all other governmental authorities or entities.

9.   The Debtors shall use their reasonable best efforts to take all actions necessary to create separate legal parcels and appropriate boundary line adjustments required under the Agreements to be entered into between the parties and to properly transfer title to the Assets to Peppermill/2000 (as the case may be) pursuant to the Agreements to be entered into between the parties.   To the extent that the parcel maps and boundary line adjustments required to convey title to the Assets in accordance with the terms of the Agreements to be entered into between the parties have not been obtained prior to the scheduled closing date, to the extent legally permissible, the Court hereby orders that the Assets be conveyed pursuant to the terms of the Agreements without the necessity of obtaining parcel maps.

10.   Peppermill/2000 are hereby deemed to be good faith purchasers within the meaning of 11 U.S.C. Section 363(m).

11.   The Debtors' Sale of the Assets to Peppermill/2000 shall be free and clear of all liens, claims and interests, including, but not limited to, the liens, claims and interests of the Lenders, Elko County and the City of West Wendover, with all such liens, claims, and interests to attach to the proceeds of

the Sale with the same validity, extent and priority as such liens existed against the Assets just prior to the closing of the Sale.

12. The terms of this Order shall be binding upon the Debtors, their estates, all creditors, all taxing authorities, parties asserting a claim or interest in the Assets, and the respective successors and assigns of any of the foregoing, including, but not limited to, any trustee appointed in the Debtors' chapter 11 cases or any subsequent chapter 7 cases.

13. The transfers made pursuant to this Order are made under the Bankruptcy Code and are not subject to any taxes, including but not limited to sales and use taxes or documentary transfer taxes, under applicable laws.

14. Notwithstanding anything contained in the Agreements or any other document to the contrary, including the Agreements to be entered into by the parties, Peppermill/2000 are not purchasing or acquiring any of the assets set forth on Exhibit "1" to this Order or any of the following:

i.    the Debtors' cash and cash equivalents (other than Bankroll Funds), accounts receivable, returned checks, and bank account(s);

ii.   the Debtors' encumbered slot machines;

iii.  the Debtors' corporate seal(s), minute book(s), original Governing Documents, and other such books and records as the Debtors are legally required to retain;

iv.  all rights that lawfully cannot be transferred by the Debtors (provided, however, that such rights shall be held by the Debtors for the benefit of Peppermill/2000 and that Peppermill/2000 at their option may act as the Debtors' agent in order to enforce and obtain for Peppermill/2000 the benefits of such rights;

v.  the Debtors' rights under this Order and the Agreements to be entered into between the parties;

vi.  all rights and assets under the Debtors' bonus, deferred compensation, incentive compensation, stock purchase, stock option, severance or termination pay, hospitalization and other medical, life and other insurance pension or retirement, profit sharing, stock appreciation rights, supplemental unemployment, layoff, consulting, fringe benefit or similar plan, program, agreement, arrangement, payroll procedure, policy or understanding.

vii. all of the Debtors' insurance policies and rights thereunder;

viii. all of the Debtors' personnel records and other records that the Debtors are required by law to retain in their possession (provided, however, that the Debtors shall provide copies thereof to Peppermill/2000 as is reasonably required by Peppermill/2000);

ix. all claims for refunds of the Debtors' taxes and other governmental charges of whatever nature relating to the operation of the Debtors' businesses prior to the closing; and

x. all of the Debtors' claims and causes of action against others including, but not limited to, all claims and causes of action arising under any of Sections 541-553 of the Bankruptcy Code (i.e., avoidance causes of action, including actions to recover preferences or fraudulent conveyances or the proceeds recovered therefrom), any third party claims that the Debtors possess.

15. In addition to the fifty-five million dollars ($55,000,000.00) of cash that Peppermill/2000 will be paying to the Debtors, Peppermill/2000 will be paying cash to the Debtors at the closing equal to the amount of the Debtors' Bankroll existing at the closing, and Peppermill/2000 will be purchasing all of the Debtors' remaining food and beverage inventory which is unopened and not outdated or unusable. '\

16. The closing date shall be the earlier of (i) November 30, 2002 and (ii) the date which is five days following approval of the Nevada Gaming Commission, with the outside closing date to be extended beyond November 30, 2002 only if necessary to obtain approval of the Nevada Gaming Commission. Under no circumstance may the closing date be extended beyond December 31, 2002, absent a further order of the Court.

17. There are no remaining conditions to closing other than approval of the Nevada Gaming Commission and Bankruptcy Court approvals and orders.

18. Peppermill/2000 are required to fund all of the Debtors' operating losses related to the Assets, based on

ordinary and necessary business expenses (calculated on a cumulative EBITDA basis), incurred by the Debtors from October 7, 2002 through the closing; provided the Debtors do not incur any expense outside the ordinary course of business without Peppermill/2000's prior written consent; there is a continuity of existing management unless Peppermill/2000 desire otherwise; and Peppermill/2000 is afforded the ability to monitor existing management to the full extent permitted by the Nevada gaming authorities, and the antitrust laws prior to the closing if Peppermill/2000 desire. Any payment on account of operating losses by Peppermill/2000 shall be made at the time of closing, except as otherwise ordered by the Court. Any disputes with regard to management, operating issues or computation of operating losses shall be resolved by the Court and may be brought before the Court on shortened time.

19. Other than pro rations which will be set forth in the Agreements to be entered into between the parties, there will be no deductions to the purchase price (e.g., for expenses such as the progressive slot liability, the chip and token liability and outstanding wagers). Peppermill/2000 shall not be obligated to assume or cure any executory contracts or unexpired leases, except those expressly designated by Peppermill/2000 (as the case may be).

20. There will be no deductions to the purchase for cure amounts owing with respect to executory contracts and unexpired leases assumed by the Debtors and assigned to Peppermill or 2000

(as the case may be), and Peppermill or 2000 (as the case may be) will be required to fund all cure amounts existing with respect to executory contracts and unexpired leases that Peppermill or 2000 (as the case may be) desire for the Debtors to assume and assign to Peppermill or 2000 (as the case may be). Peppermill/2000 shall not be obligated to assume any executory contracts or unexpired leases except those expressly designated by Peppermill or 2000 (as the case may be).

21. A hearing will be held on December 6, 2002, at 2:00 p.m., for the Court to consider any motion filed by the Debtors to assume and assign executory contracts and unexpired leases (the "Assigned Contracts") to Peppermill/2000. The Debtors shall be required to file any such motion by October 20, 2002.

22. In connection with any such assumption by the Debtors and assignment to Peppermill/2000 of Assigned Contracts, Peppermill/2000 shall assume all of the Debtors' obligations under such Assigned Contracts, and Peppermill or 2000 (as the case may be) will be required to [1] cure or provide adequate assurance that it will promptly cure all defaults existing under the Assigned Contracts, [2] compensate or provide adequate assurance that it will promptly compensate all parties other than the Debtors to the Assigned Contracts for any actual pecuniary loss to such parties resulting from any defaults existing under the Assigned Contracts, and [3] provide adequate assurance of future performance under the Assigned Contracts.

23.  Peppermill/2000 shall have the right to monitor the management of the Debtors until the closing to the full extent permitted by the Nevada Gaming Commission and the antitrust laws.

24.  CP is hereby approved as the backup bidder with a purchase price of $46 million.  CP shall be required to consummate its purchase of the Assets in accordance with the terms of this Order within three months following receipt by CP of written notice of the failure of Peppermill/2000 to consummate their purchase of the Assets.  However, CP's obligation to fund the Debtors' operating losses shall be limited to operating losses incurred by the Debtors from the date of receipt by CP of written notice of the failure of Peppermill/2000 to consummate their purchase of the Assets through the closing of the Debtors' sale of the Assets to CP (provided the Debtors do not incur any expense outside the ordinary course of business without CP's prior written consent; there is a continuity of existing management unless CP desires otherwise; and CP is afforded the ability to monitor existing management to the full extent permitted by the Nevada gaming authorities and the antitrust laws prior to the closing if CP desires).

25.  As requested by the Debtors, in consideration for serving as the initial bidder, Capri shall be entitled to seek to be reimbursed by the Debtors' estates for Capri's actual out-of-pocket third party expenses (including professional fees and expenses) not to exceed $750,000, after notice and a hearing.

26.  The  $500,000  administrative  claim  asserted  by Peppermill in connection with the Original Sale Agreement is hereby deemed withdrawn.  Peppermill and the Debtors are hereby deemed to have permanently and forever waived any and all claims that they may have against the other with respect to the Original Sale Agreement or any actions taken or not taken in connection with the Original Sale Agreement.

27.  The Court shall retain sole and exclusive jurisdiction over all matters arising from or related to this Order, the Sale of the Assets, the Agreements, the assumption and assignment of Assigned  Contracts,  and  the  implementation  thereof  and enforcement of this Order.

IT IS SO ORDERED:

Dated:  November ___, 2002

_____
THE HONORABLE GREGG W. ZIVE
UNITED STATES BANKRUPTCY JUDGE


LIONEL SAWYER & COLLINS


By: _____*Jennifer Smith*_____
    Jennifer Smith
    Attorneys for
    WENDOVER CASINOS, INC.,
    a Nevada corporation;
    WENDOVER COMMERCIAL PROPERTIES, INC.,
    A Utah corporation;
    PEPPERMILL PROPERTIES, LLC

1
2  SCHRECK, BRIGNONE

3

4
By:  Leslie Terry Jones
5  Attorneys for Generation 2000

6

7  LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.

8

9  By:  Ron Bender
       Nellwyn W. Voorhies
10     Attorneys for
       SMITH PROPERTIES, a Nevada general partnership
11     JIM'S ENTERPRISES, INC., a Nevada corporation
       STATE LINE HOTEL, INC., a Nevada corporation
12     STATE LINE PROPERTIES, INC., a Utah corporation
       STATE LINE CASINO, a Nevada general partnership
13     STATE LINE PROPERTIES, LTD., a Utah limited partnership
       STATE LINE APARTMENTS, LTD., a Utah limited partnership
14

15  JONES VARGAS

16

17
By:  Amy N. Tirre
18     Attorneys for CP Wendover, LLC

19

20  KINGSMILL RIESS, L.L.C.

21

22  By:  Marguerite K. Kingsmill
       Attorneys for SLP Properties, Inc.

23

24

25

26

27

28

```
 1
 2   SCHRECK, BRIGNONE
 3
 4   _____
 5   By:  Leslie Terry Jones
     Attorneys for Generation 2000
 6
     LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
 7
 8
 9   By:  Ron Bender
          Nellwyn W. Voorhies
10        Attorneys for
          SMITH PROPERTIES, a Nevada general partnership
11        JIM'S ENTERPRISES, INC., a Nevada corporation
          STATE LINE HOTEL, INC., a Nevada corporation
12        STATE LINE PROPERTIES, INC., a Utah corporation
          STATE LINE CASINO, a Nevada general partnership
13        STATE LINE PROPERTIES, LTD., a Utah limited partnership
          STATE LINE APARTMENTS, LTD., a Utah limited partnership
14
15   JONES VARGAS
16
17   _____
     By:  Amy N. Tirre
18        Attorneys for CP Wendover, LLC
19   KINGSMILL RIESS, L.L.C.
20
21
22   _____
     By:  Marguerite K. Kingsmill
          Attorneys for SLP Properties, Inc.
23
24
25
26
27
28
```

1

2  SCHRECK, BRIGNONE

3

4  _____
   By:  Leslie Terry Jones
5  Attorneys for Generation 2000

6
   LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
7

8  _____
   By:   Ron Bender
9        Nellwyn W. Voorhies
         Attorneys for
10       SMITH PROPERTIES, a Nevada general partnership
11       JIM'S ENTERPRISES, INC., a Nevada corporation
         STATE LINE HOTEL, INC., a Nevada corporation
12       STATE LINE PROPERTIES, INC., a Utah corporation
         STATE LINE CASINO, a Nevada general partnership
13       STATE LINE PROPERTIES, LTD., a Utah limited partnership
         STATE LINE APARTMENTS, LTD., a Utah limited partnership
14

15  JONES VARGAS

16

17  _____
   By:   Amy N. Tirre
18       Attorneys for CP Wendover, LLC

19
   KINGSMILL RIESS, L.L.C.
20

21
   _____
22  By:   Marguerite K. Kingsmill
         Attorneys for SLP Properties, Inc.

23

24

25

26

27

28

                                    23

FROM  NOV. 18. 2002  2:36PM   ARMSTRONG MILLER LLP          NO. 8923   P. 27/31
NOV. 15. 2002  3:19:11          NOV 15 2002 15:33/ST. 15:28/No. 6330119778 P 27

1 | SCHRECK, BRIGNONE

2

3

4 | By:  Leslie Terry Jones
5 | Attorneys for Generation 2000

6

   | LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
7

8

9 | By:  Ron Bender
   |      Nellwyn W. Voorhies
10|      Attorneys for
   |      SMITH PROPERTIES, a Nevada general partnership
11|      JIM'S ENTERPRISES, INC., a Nevada corporation
   |      STATE LINE HOTEL, INC., a Nevada corporation
12|      STATE LINE PROPERTIES, INC., a Utah corporation
   |      STATE LINE CASINO, a Nevada general partnership
13|      STATE LINE PROPERTIES, LTD., a Utah limited partnership
   |      STATE LINE APARTMENTS, LTD., a Utah limited partnership
14

15| JONES VARGAS

16

17| By:  Amy N. Tirre
18|      Attorneys for CP Wendover, LLC

19| Approved as to form.
   | KINGSMILL RIESS, L.L.C.
20

21| _Marguerite Kingmill_

   | By:  Marguerite K. Kingmill
22|      Attorneys for SLF Properties, Inc.

23

24

25

26

27

28

Approved as to form and content:

BECKLEY SINGLETON, CHTD.

By:    Bob L. Olson
       Attorneys for the
       OFFICIAL COMMITTEE OF UNSECURED CREDITORS

PILLSBURY WINTHROP LLP


By:    Catherine D. Meyer
       Mark D. Houle
       Attorneys for
       ZION FIRST NATIONAL BANK

Approved as to form and content:

BECKLEY SINGLETON, CHTD.

By: Bob L. Olson
Attorneys for the
OFFICIAL COMMITTEE OF UNSECURED CREDITORS

PILLSBURY WINTHROP LLP

By: Catherine D. Meyer
Mark D. Houle
Attorneys for
ZION FIRST NATIONAL BANK

26.  The  $500,000  administrative  claim  asserted  by
Peppermill in connection with the Original Sale Agreement is
hereby deemed withdrawn.  Peppermill and the Debtors are hereby
deemed to have permanently and forever waived any and all claims
that they may have against the other with respect to the Original
Sale Agreement or any actions taken or not taken in connection
with the Original Sale Agreement.

27.  The Court shall retain sole and exclusive jurisdiction
over all matters arising from or related to this Order, the Sale
of the Assets, the Agreements, the assumption and assignment of
Assigned  Contracts,  and  the  implementation  thereof  and
enforcement of this Order.

IT IS SO ORDERED:

Dated:   November /8, 2002

THE HONORABLE GREGG W. ZIVE
UNITED STATES BANKRUPTCY JUDGE

LIONEL SAWYER & COLLINS


By:   Jennifer Smith
      Attorneys for
      WENDOVER CASINOS, INC.,
      a Nevada corporation;
      WENDOVER COMMERCIAL PROPERTIES, INC.,
      A Utah corporation;
      PEPPERMILL PROPERTIES, LLC

I certify that this is a true copy
Attest:
Deputy Clerk, Bankruptcy Court

**EXHIBIT "1"**

**(EXCLUDED ASSETS)**

1.  The following properties:

    a.  Jim's Trailer Court (6.58 acres)

    b.  SL Properties, Ltd. & SL Properties, Inc. (10.60 acres) – SW Corner of East Wendover Blvd. & Wildcat Blvd. (400 East)

    c.  SL Properties, Ltd. (17.1 acres) – 951 East Wendover Blvd.

    d.  Smith Properties (230 acres west of Wells, NV)

    e.  SL Properties Ltd. (5 units at Sierra Lane -- .25 acres) – Wendover, UT

    f.  SL Apartments (64 dormitory units, including 2 storage units to the north) – 165 Pilot Avenue

2.  The stock of State Line Properties, Inc. owned by State Line Hotel, Inc.

3.  State Line Properties, Inc.'s interest in State Line Properties, Ltd.

4.  State Line Properties, Ltd.'s interest in State Line Apartments

5.  Various antique slot machines

6.  All stocks and shares of and all interests in Wells Rural Electric Company

# EXHIBIT

# B



## L N B R & B

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

LAW OFFICES

December 15, 2003

David Ensign
101 Wendover Boulevard
West Wendover, NV 89883

     Re:    State Line Hotel, Inc. et al

Dear Mr. Ensign:

     This letter is written in response to your inquiries regarding Generation 2000, Ltd. ("Gen2000"), obligation to fund all of the operating losses incurred by Smith Properties, Jim's Enterprises, Inc., State Line Hotel, Inc., State Line Properties, Inc., State Line Casino, State Line Properties, Ltd., and State Line Apartments (collectively, the "Debtors") related to the purchased assets for the period from October 7, 2002 through the closing of the sale (the "Closing Period"). As you know, pursuant to the order governing the sale of the assets of losses are based on ordinary and necessary business expenses calculated on a cumulative EBITDA basis.

     Hansen, Barnett & Maxwell, the Debtors' accountants, have completed audited financials of the Debtors and reconciled the calculated losses against those financials. This has resulted in an adjustment to the amount owing by Gen2000. Losses of $467,621 can be attributed to the operations of the State Line Hotel and Casino, and therefore must be reimbursed by Gen2000. Enclosed herewith is a summary of those losses by month, as well as the accountants' notes regarding the methodology of calculating losses. We believe this should answer any questions you have regarding the losses. Please remit payment of this amount to our offices by January 5, 2004, as we are attempting to close out these estates. If we do not receive payment at that time we will seek an order from the Bankruptcy Court compelling payment.

                               Very truly yours,

                               Nellwyn W. Voorhies

Enclosures
cc:    Ron Bender, Esq.
        Sallie Armstrong, Esq.
        Kaaran Thomas, Esq.
        Kevin Butler (w/encls.)
        William Barnwell (w/encls.)

EXHIBIT B

B 104
(Rev. 8/87)

**ADVERSARY PROCEEDING COVER SHEET**
(Instructions on Reverse)

ORIGINAL

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| STATE LINE HOTEL, INC., a Nevada corporation | GENERATION 2000, LLC, a Nevada limited liability company |

ATTORNEYS (Firm Name, Address, and Telephone No.)
Sallie B. Armstrong
Downey Brand LLP, 427 W. Plumb Lane
Reno, NV 89509
(775) 329-5900

ATTORNEYS (If Known)

*[stamp]* 2004 JAN 16 PM 2: 21
UNITED STATES
BANKRUPTCY COURT
PATRICIA GRAY, CLERK
RECEIVED AND FILED

**PARTY** (Check one box only)  ☐ 1 U.S. PLAINTIFF  ☐ 2 U.S. DEFENDANT  ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
COMPLAINT TO ENFORCE COMPLIANCE WITH COURT ORDER AND SEEKING PAYMENT OF AMOUNTS OWED PURSUANT TO SALE OF ASSETS

**NATURE OF SUIT**
(Check the one most appropriate box only.)

☒ 454 To Recover Money or Property
☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property
☐ 424 To object or to revoke a discharge 11 U.S.C. §727

☐ 455 To revoke an order of confirmation of a Chap. 11 or Chap. 13 Plan
☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523
☐ 434 To obtain an injunction or other equitable relief
☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action
☐ 459 To determine a claim or cause of action removed to a bankruptcy court
☐ 498 Other (specify)

**ORIGIN OF PROCEEDINGS**
(Check one box only.)

☒ 1 Original Proceeding
☐ 2 Removed Proceeding
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another Bankruptcy Court

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

| DEMAND | NEAREST THOUSAND $ 467,621.00 | OTHER RELIEF SOUGHT | ☐ JURY DEMAND |
|---|---|---|---|

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| State Line Hotel, Inc., et al. | BK-N-02-50085-GWZ |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| District of Nevada | | Judge Gregg W. Zive |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

**FILING FEE** (Check one box only.)  ☐ FEE ATTACHED  ☐ FEE NOT REQUIRED  ☐ FEE IS DEFERRED

| DATE 1/16/04 | PRINT NAME Sallie B. Armstrong | SIGNATURE OF ATTORNEY (OR PLAINTIFF) *[signature]* |
|---|---|---|